## Independence Township School District Appeal.

Argued March 20, 1963.   Before BELL, C. J., MUS-
MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS,
JJ.

304

*James E. Rowley*, with him *Myron E. Rowley*, *Ralph E. Smith*, and *Rowley, Smith & Rowley*, for appellant.

*John D. Ray*, with him *Alan C. Davis*, and *Ray & Good*, for appellee.

OPINION BY MR. JUSTICE ROBERTS, October 10, 1963:

This appeal by Independence Township School District of Beaver County is from the orders of the court below which sustained the exemption from real estate taxes of certain buildings, fourteen tanks and seventy-two acres (of approximately 218 acres) of land owned by Laurel Pipe Line Company granted by the Beaver County Board of Assessment and Revision of Taxes for the years 1960 and 1961.

Laurel Pipe Line Company was organized and incorporated as a Pennsylvania corporation on March 1, 1957, and was granted a certificate of public convenience by the Pennsylvania Public Utility Commission on March 8, 1957.[1] On March 18, 1957, the same

---

[1] Laurel was authorized to operate a petroleum products pipeline under the Corporation Act of 1874, April 29, P. L. 73, §1, 15 P.S. §1, as supplemented by the Act of June 2, 1883, P. L. 61, as amended, 15 P.S. §2153, subject to regulation by the Pennsylvania Public Utility Commission under the Public Utility Law, May 28, 1937, P. L. 1053, as amended, 66 P.S. §§1101-1562. The Act of June 2, 1883 (15 P.S. §2153) empowers pipeline companies incorporated for the purpose of transportation, storage, and distribution of petroleum products to appropriate and condemn lands, easements and rights of way subject to approval of the Pennsylvania Public Utility Commission, in addition to the other powers of such companies.

company was incorporated under the laws of Ohio. It was granted a certificate of public convenience by the Ohio authorities and began business as a public utility on March 25, 1957. The present Laurel Company is the result of merger of the two companies. The Ohio corporation became a parent company through acquisition of the shares of the Pennsylvania corporation. This acquisition was approved on October 1, 1957, by the Public Utilities Commission of Ohio, and on October 7, 1957, the parent company was granted permission to do business in Pennsylvania. The merger of the two companies was begun in July, 1959, and became effective January 1, 1960, following approval on November 23, 1959, by the Pennsylvania Public Utility Commission. The Commission's certificate of public convenience authorized Laurel Pipe Line Company, a foreign public utility, to engage in transporting, storing and distributing petroleum and petroleum products by means of pipelines and appurtenances for the public, extending generally westward from a point near Philadelphia to the vicinity of Pittsburgh, and then northwesterly to the Pennsylvania-Ohio border.

Laurel owns and operates a pipeline 446.5 miles in length extending from Westfield, New Jersey to Cleveland, Ohio, which transports three grades of gasoline, fuel oil for home heating, fuel oil for heating factories, diesel fuels and kerosene. These products are moved from east to west through the pipeline. Its Booth station in Delaware County receives shipments of products from tank farms of its shippers in the Philadelphia and New Jersey area, which shipments are then moved westward to various take-off stations along the route.[2] From Booth station to Mechanicsburg, the pipeline is 24 inches in diameter. At Me-

---

[2] The pipeline passes through Chester, Berks, Lebanon, Cumberland, Huntingdon, Blair, Cambria, Westmoreland, Allegheny, and Beaver Counties before entering Ohio.

chanicsburg, the pipeline diminishes to 20 inches and continues to Eldorado and Duncansville in Blair County, at which point the line diminishes to 18 inches. After reaching the pumping station in Independence Township, Beaver County, the pipeline diminishes to 14 inches and continues approximately 100 miles to take-off stations in Cleveland, Ohio.

During the tax years 1958 and 1959, while Laurel's pumping station was under construction in Independence Township, property taxes were paid on the assessed valuation of all the land, consisting of approximately 218 acres. The tax year 1960 was the first year in which the facilities were completed and the station placed in operation. At this station (called Aliquippa) are fourteen tanks, several buildings and other facilities. No deliveries are made at Independence and no products are there received for shipment. The tank capacities were based upon studies made for anticipated transit volumes through 1965 and certain anticipated monthly cycles for each product to be shipped.[3] Ten of the tanks are used for specifically designated products and one tank is used for kerosene, a common product. Three tanks are used as utility tanks. As pointed out by the lower court, these tanks are used "much in the same manner as a railroad uses its sidings off the main line."

---

[3] "The tankage and the capacities thereof were designed in a tankage requirement study which was completed June 28, 1957, based upon anticipated 1965 throughput volumes, and certain anticipated monthly cycles for each product to be shipped. This study was based primarily upon, in addition to estimated 1965 volumes, carefully planned scheduling cycles and procedures.

"The anticipated throughput volume, in addition to being the basis for the tankage constructed at the Aliquippa Station, also served as the basis for the various pipeline diameters along the line. . . . Since the advent of import restrictions and quotas, anticipated throughput gallonage to date has not reached the original estimates." (From the opinion of the court below.)

The Board of Assessment and Revision of Taxes ruled that for the year 1960, the 72 acres of land actually used for the station were exempt from local taxes.[4] The court below sustained the exemption, and this appeal followed.

Appellant contends that Laurel Pipe Line Company is not a public service corporation or a quasi-public corporation rendering essential services to the public, but rather that it is basically a private corporation whose services are used by three refiners, Gulf, Sinclair, and Texaco, who own all of the stock of Laurel and who direct its affairs.[5] It is urged that the corporate veil be pierced and that Laurel and its shareholders be considered as one and the same entity. In the alternative, the contention is made that the facilities in the township are not essential to the overall operation of the pipeline and are, therefore, taxable.

In passing on the questions raised, we must determine the essential character of the corporation claiming exemption from taxation of its property. As already noted, Laurel Pipe Line Company, the Pennsylvania corporation, was organized for the transportation and storage or distribution of petroleum products by means of pipelines and subjected to the regulatory jurisdiction of the Pennsylvania Public Utility Commission. It was vested with the right of eminent domain "for locating and constructing, or laying and operating, necessary pipes, pumps, tanks, pump houses,

---

[4] The court below observed, "The Laurel Pipe Lines does now pay, in lieu of local real estate tax, a foreign excise tax, a gross receipts tax, a franchise tax, a corporate net income and loan tax, as well as other miscellaneous State taxes." In addition, it pays a tax to cover its share of the expenses of the Public Utility Commission.

[5] The capital stock of Laurel is owned by Gulf Oil Corporation (40%), Sinclair Pipe Line Company (35%), and Texaco, Inc. (25%).

structures, and offices and making connections and extending branches necessary and incident to the carrying on of its local or interstate business. . . ." Act of June 2, 1883, P. L. 61, §2, as amended, 15 P.S. §2153. The Pennsylvania Public Utility Commission approved its purposes and its route, as well as its merger with the Ohio corporation, and issued to the parent corporation, after registration as a foreign corporation, a certificate of public convenience.

In *Philadelphia Rural Transit Co. v. Philadelphia*, 309 Pa. 84, 91, 159 Atl. 861, 863 (1932), this Court held: "The possession of the power of eminent domain is not what gives a corporation a quasi public status for there are quasi public corporations that do not possess this power; rather the fact that a corporation is quasi public is what entitles it to a grant of the power of eminent domain when the exercise of its functions requires it." The Legislature, by granting the right of eminent domain to pipeline companies, has recognized that they carry on an essential activity affected with a substantial public interest. The transportation of gasoline, kerosene, diesel and fuel oils so directly affects the daily needs of the Commonwealth and its citizens that any extended stoppages would create serious hardships in practically every area of our existence.

Undoubtedly, these and other considerations of public policy and welfare compel the conclusion that operations of pipeline companies are impressed with a public trust.

"The conferring upon a corporation by the State of the power of eminent domain is an official recognition of the fact that the corporation receiving this grant of power is engaged in a business so vital to the public welfare that it is really engaged in the administration of a public trust, and therefore it is entitled to the classification of a quasi public corpora-

tion and the property essential to the administration of that trust is exempt from all taxation except that imposed directly by the sovereign." *Philadelphia Rural Transit Co. v. Philadelphia,* supra at 91, 159 Atl. at 863. See *Longvue Disposal Corp. v. Board of Property Assessment,* 375 Pa. 35, 99 A. 2d 464 (1953); *Conoy Township Supervisors v. York Haven Electric Power Plant Co.,* 222 Pa. 319, 71 Atl. 207 (1908).

The test of a public service corporation is not what the corporation has done or may attempt to do, but what it is authorized to do and may be compelled to do under its charter in the performance of the duties imposed. *Pittsburgh & Lake Erie Railroad v. Allegheny County,* 283 Pa. 220, 128 Atl. 840 (1925); *Conoy Township Supervisors v. York Haven Electric Power Plant Co.,* supra.

The legislative authority to "exempt from taxation public property used for public purposes" is conferred by §1, Article IX of the Pennsylvania Constitution. The succeeding section reaffirms the limitation of that authority by providing, "All laws exempting property from taxation, other than the property above enumerated shall be void." Article IX, §2. To qualify for exemption, it must be established that the property is being used for a public purpose. The determination whether a proposed use is a public one is a question for ultimate judicial determination. *West View Borough Municipal Authority Appeal,* 381 Pa. 416, 113 A. 2d 307 (1955); *Dornan v. Philadelphia Housing Authority,* 331 Pa. 209, 222, 200 Atl. 834, 841 (1938). The legislative declaration that the use to which property is being put is a public one, by reason of which the power of eminent domain is granted, although not conclusive, is entitled to prima facie acceptance. *McSorley v. Fitzgerald,* 359 Pa. 264, 59 A. 2d 142 (1948); *Dornan v. Philadelphia Housing Authority,* supra.

The court below found upon competent and adequate evidence that Laurel Pipe Line Company is a quasi-public corporation operating as a common carrier in the transportation of petroleum products in inter and intrastate commerce serving those who desire to use its facilities. Likewise, fully supported by the record is the court's finding that Laurel's actual use of the tanks and facilities at the Aliquippa station is an essential and integral part of the pipeline operation and necessary to its continued functioning as a public utility service. The operation of Laurel is described in the opinion of the court below, excerpts from which appear in the margin.[6]

---

[6] "Because of the timing and flow requirements of the pipeline, it is necessary to set up schedules at least four to eight weeks in advance, depending upon the time of year and the current supply and demand situation. Each shipper provides the Laurel scheduler with a list of anticipated requirements at each of its terminals. However, consumer demands change frequently and the scheduler must re-schedule deliveries as requested by each shipper in order to assure an adequate supply of petroleum products for both shippers and consumers with the minimum delay. Frequently an entire order will be cancelled out after it has gone into the line. Once the product has left Booth Station and the order is cancelled, the product must be diverted to some other take-off terminal of the shipper, in consonance with his requirements there, and/or diverted into tankage at Aliquippa until it can be worked back into shipper's schedule for westward deliveries.

. . .

"The tanks at Aliquippa are used to remove certain products from the pipeline permitting other products which may be more urgently needed, according to eleventh-hour re-scheduling, to pass for deliveries to Ohio terminals, much in the same manner as a railroad uses its sidings off the main line, or a power and light company uses its substations and relay stations.

"In order to assure reasonable pipeline operating conditions, and flow requirements, it is essential for Laurel to re-group products in transit at Aliquippa for delivery to Ohio terminals resulting in stocks of shipper's products remaining temporarily in working tankage at Aliquippa. This temporary retention is not predi-

If appellant's contention is sound, Laurel could be subjected to local taxation in every county, city, borough or township through which its line runs.[7] The

cated upon the shipper's ability to receive the product, but rather to allow the carrier to maintain minimum batches of approximately 25,000 barrels of specific product in transit, which is necessary to reduce the percentage of batch contamination, and larger than normal downgrading because of interface. In other words, by the time shipments of specific products reach Aliquippa, they may be in smaller than 25,000 barrels because of diversions into previous take-off terminals, which may have been scheduled at the very last minute.

"In addition to the cancellation problem, the temporary diversion to allow more urgently needed products to go into the line at Aliquippa, and minimum barrel requirements, there are further reasons for the working tankage at Aliquippa. . . . In order to keep the pipeline full, products can be pumped out of Aliquippa during only a fraction of the operating hours. Of course, due to scheduling requirements east of Aliquippa, batches may be coming into Aliquippa while schedule west of Aliquippa does not warrant shipments out of Aliquippa. Therefore, incoming batches will be diverted into temporary tankage at Aliquippa.

"The present usage of the fourteen tanks presently being operated at Aliquippa (it should be noted at this point that Laurel owns sufficient real estate at its Aliquippa Station for the erection of further tankage as and if required by the future business of additional shippers) is necessary to preserve the brand identity of products presently transported by Laurel and they are not permanently assigned to any one product brand or shipper. In fact, if, in the near future, additional shippers should make use of Laurel pipeline facilities, their individual products could also be accommodated with the present physical capacity of the Aliquippa Station. The products transmitted through Laurel pipeline are always the property of the shipper. However, it should be re-emphasized that no shipper has any authority over the scheduling or re-scheduling of any of its products nor over its retention temporarily in tankage at Booth Station or Aliquippa Station according to the judgment of the Laurel scheduler."

[7] In the words of the court below, "Not a single county in Pennsylvania, outside of Beaver County, through which the pipeline and its facilities run, has attempted to tax the facilities used and useful in the operation of the pipeline."

very existence or survival of quasi-public corporations would, in that event, rest in a real sense not with the Commonwealth but with the numerous local taxing bodies.

Appellant further contends that Laurel is not a quasi-public corporation because all of the stock in the company is owned by three stockholders. It urges that the corporate identity be ignored and the working tankage at Aliquippa be regarded as belonging to the three shareholders. In *Harrisburg v. Harrisburg Railways Co.,* 319 Pa. 140, 179 Atl. 442 (1935), we held that even though one corporation owns all the capital stock of and receives all the dividends paid thereon by another corporation, the two separately chartered corporations are separate and distinct legal entities. It is clear that stock ownership in Laurel does not compel the conclusion that Laurel is Gulf, Sinclair and Texaco.[8]

Our attention has not been directed to any case in which this Court has refused to extend the exemption from local taxation where the corporation in question was vested with the power of eminent domain. Indeed, the lower court observed that this Court has never failed to extend the exemption to such a corporation, and its determination that Laurel Pipe Line Company is a public utility is in harmony with decisions of the Pennsylvania Public Utility Commission and the Pennsylvania Department of Revenue,

---

[8] Although Gulf, Sinclair and Texaco are the only users of the pipeline at the present time, the court below noted that "officials of Laurel Pipe Line Company have continuously attempted, through advertising media, industry committees, conventions, and other situations and places in which potential shippers gather, to seek new business for the pipeline. The need for new business is emphasized and underscored by the extremely low volume of business which Laurel presently enjoys and which is more costly and burdensome than as if Laurel were able to secure a larger through-put volume."

Bureau of Sales and Use Tax, involving this company.

The adjudication of the court below is without error, and its orders, therefore, must be affirmed.

Orders affirmed.