Board for the Assessment and Revision of Taxes of Lancaster County, Township of Drumore, Township of Martic, Solanco School District and Penn Manor School District, Appellants, *v.* Philadelphia Electric Company, Appellee.

Argued June 4, 1973, before President Judge Bowman and Judges Crumlish, Jr., Kramer, Wilkinson, Jr., Mencer, Rogers and Blatt.

Lawrence J. Lee, with him Carl G. Herr, and Goodis, Greenfield, Henry, Shaiman & Levin, for appellants.

Roberts R. Appel, with him Charles Foltz Herr, and Appel, Herr & Appel and, of counsel, Edward G. Bauer, Jr. and Eugene J. Bradley, for appellee.

OPINION BY PRESIDENT JUDGE BOWMAN, August 9, 1973:

These are appeals by the County of Lancaster, two townships and two school districts from an order of the Court of Common Pleas of that county striking from the assessment rolls additional assessments made for the years 1965, 1966 and 1967 against the real property of Philadelphia Electric Company ("PECO") acquired by it for a project known as the Muddy Run Pumped Storage Hydro-Electric Project which was under construction during the years in question. The case was factually stipulated.

In the fall of 1962, by purchase or condemnation, PECO began to acquire title to tracts of combined woodland and farmland in Lancaster County; these tracts, aggregating about 3,000 acres, were improved generally with farm buildings and residences.

The land so acquired included the land bordering both banks of a small stream known as Muddy Run winding westwardly through a ravine between high bluffs to the Susquehanna River.

The land was acquired for the construction of a pumped-storage generating plant for the production of

electric power to be fed into the transmission system of PECO to better meet at peak demand times the increasing and expanding demand for electric power in PECO's electric service area and to improve the reliability of its service.

A pumped-storage generating plant produces electric power by means of water flowing by gravity from an artificially created reservoir at a high level through turbines into a body of water at a lower level; the flowing water drives the turbines, which in turn drive generators thereby producing electricity. To replenish the supply of water in the high level reservoir, the turbines and generators are reversed and the generators act as motors and the turbines act as pumps to drive the water up into the upper level reservoir where it is stored. Ordinarily, generation of electricity occurs in peak-load periods during weekdays, while pumping is done during low demand periods at night and on weekends.

The pumped-storage generating plant to be constructed on the Muddy Run site contemplates the use of the Susquehanna River to provide the water for its operation to produce electric power, and since the Susquehanna River is a navigable stream subject to the jurisdiction of Congress, PECO was required to obtain a license from the Federal Power Commission under the Federal Power Act.

As a condition precedent to the grant of this federal license, PECO had to make provision for various beneficial public uses, including recreation, the burden of which runs with the license for its duration.

To satisfy this condition precedent, PECO proposed to the Federal Power Commission that approximately five hundred (500) acres be developed by it for a game preserve and an area of approximately seven hundred seventy (770) additional acres be developed by it for public recreational purposes to be operated by PECO

without profit. The proposed development of the recreational area included the construction of a dam across one of the fingers of the water storage facility to form an independent lake having a stable water level for its use by the public for boating and fishing. The water level of the water storage facility changes up to fifty (50) feet in the pumped-storage generating and pumping cycles.

The Federal Power Commission having determined that the proposal of PECO to provide for beneficial public use, including recreation, satisfied the condition precedent, issued its license effective for fifty (50) years to PECO in the fall of 1964 to construct the pumped-storage facility.

Thereafter, PECO proceeded to construct the pumped-storage generating plant. The first two of its eight 110,000 kilowatt generating units began commercial operation on April 10, 1967, with the remaining six units being placed in commercial operation June 1, 1967, October 11, 1967, and February 10, 1968.

With the exception of the expenditures associated with the recreation dam, all of the expenditures on which the additional assessments were based were for the construction of the pumped-storage generating plant.

For the years 1965, 1966 and 1967, the real estate acquired by PECO was included in the annual assessment roll without any adjustment for improvements relating to the pumped-storage generating plant then in the course of construction.

No appeals from the annual assessments were filed with the Lancaster County Board for the Assessment and Revision of Taxes. The assessments were certified to the appropriate local taxing authorities for local taxation. PECO paid the local taxes due on the assessments for each of the years 1965, 1966 and 1967.

On March 1 and March 6, 1967, and on May 28, 1968, the Board gave notice of 21 additional assessments based upon expenditures made by PECO in the construction of the pumped-storage generating plant and the recreation dam.

Timely appeals to the Board being filed by PECO, the Board entered its orders finally fixing the amounts of the additional assessments in the respective amounts set forth in the notices of additional assessments and certified the same to the local taxing authorities who sent tax notices to PECO of additional taxes of $1,-922,292.50. From such additional assessments PECO filed timely appeals with the Court of Common Pleas, which struck down said additional assessments.

Are facilities of a public utility essentially necessary to its service to the public subject to local government real estate assessment and taxation during the course of construction of such facilities prior to their actual employment in rendering the public service?

If not, should a recreation area required by the Federal Power Commission to be constructed and maintained as a condition to obtaining a federal license for a project, be subjected to such taxation during the course of construction of the recreational area?

An alternative issue to that of the taxability of the recreation area during its construction is whether the additional assessments as to the recreation area were made as provided by law.

Prior to the adoption of the 1968 Constitution of Pennsylvania, it was repeatedly declared by decisional law that property of quasi-public bodies was not subject to local real estate taxation.

"The exemption of public utility realty from local real estate taxes was developed in a line of Pennsylvania Supreme Court decisions holding that the grant of the power of eminent domain by the Legislature is

'official recognition' that the business of the utility grantee is so vital to the public welfare that it is engaged in the administration of a public trust, and therefore is entitled to the classification of a quasi-public corporation, and on that basis entitled to exemption from local taxation on its realty devoted to the public service. See Independence Township School District Appeal, 412 Pa. 302, 194 A. 2d 437 (1963). Also see Exemption of Real Property of Public Utilities From Local Taxation in Pennsylvania, 13 University of Pittsburgh Law Review 263 (1952)." *Duquesne Light Co. v. Board of Property Assessment, Appeals and Review of Allegheny County, Pennsylvania,* 10 Pa. Commonwealth Ct. 41 n. 3, 299 A. 2d 660 n. 3 (1973).

In *Longvue Disposal Corporation v. Board of Property Assessment, Appeals and Review of Allegheny County,* 375 Pa. 35, 99 A. 2d 464 (1953), after reviewing a number of its decisions out of which this principle evolved, our Supreme Court stated that the sole issue is whether the realty owner is a quasi-public body performing an essential public service. If so, its realty has not been brought by the Legislature within the scope of the statutes authorizing local taxation of real property.

In the instant appeals, appellants recognize these precedents and do not ask us to overrule them if, indeed, we could. *See Lovrinoff v. Pennsylvania Turnpike Commission,* 3 Pa. Commonwealth Ct. 161, 281 A. 2d 176 (1971). They do assert, however, that we should not extend them to public utility facilities during the period of their construction. Until the facilities are actually in use in furtherance of the public purpose they contend such facilities should be subject to local taxation. To support their position appellants advance the multiple and oft-repeated political and social-economic reasons historically advanced in support

of local taxation of public utility realty most recently aired during the 1967-1968 Pennsylvania Constitutional Convention which culminated in the adoption of Article VIII, Section 4, of the 1968 Constitution of Pennsylvania. Such arguments are not persuasive as, in our opinion, prior decisional law requires a contrary result.

If, prior to the adoption of our new Constitution, realty owned by a quasi-public body performing an essential public service and devoted to that service was not subject to local real estate taxation for want of legislative action subjecting it to such taxation, it is difficult to conceive by what theory facilities under construction of such a quasi-public body should be subjected to taxation during the period of time necessary to construct them. The same considerations and the same reasoning which led our Supreme Court to declare such facilities free of local taxation when devoted to the public service are equally applicable to such facilities during the period reasonably necessary for their construction.

Although not frequently raised, this specific issue has been reached by at least one prior decision. In *Delaware, Lackawanna and Western R. R. Co's. Appeal,* 25 Pa. Dist. 596 (1916), the court states at 596: "The contention of the commissioners is that the land is taxable because, when assessed, the railroad for which it was being prepared was not in operation upon it. It is conceded that if the railroad had then been completed and was in actual use, the land would not be taxable for local purposes." The commissioners' contention was similarly rejected by the court and the attempted taxation of the improvements was disallowed. *See also Martic Township School District v. McCall Ferry Power Company,* 27 Lanc. L. Rev. 105 (1910).

The final consideration alternatively concerns the taxability of the recreational area while under the construction and the validity of the additional assessments made against it for the years in question. We shall first consider the second alternative.

Section 7 of the pertinent statute then in effect, Act of June 26, 1931, P. L. 1379, as amended,[1] provides: "The said board shall, before the 15th day of September, examine and revise the said annual assessments and valuations, increasing or decreasing the same as in their judgment may seem proper, and shall add thereto and assess such property . . . as may have been omitted . . . *and such added assessments may be used for the taxation of the property . . . only for the current year and the preceding three years if there was liability for such taxes under existing law."*

The first part of this section, pertaining to examination and revision of annual assessments, is separate and distinct from that part relating to the addition of omitted property to the tax rolls. The first part is applicable to those properties currently on the tax rolls while the second part refers to those properties totally absent or omitted from the rolls.

The phrase "and such added assessments" refers to assessments made on omitted properties and does not refer or apply to revision of assessments on property already on the tax rolls. Therefore, it is only with respect to omitted property that a three year retroactive assessment is permitted. In the case at bar, PECO's land was annually assessed in the years 1965, 1966 and 1967 as unimproved property and so placed upon the tax rolls. Since the property was affirmatively assessed in each of the three years in question, it cannot now be

---

[1] As subsequently amended by the Act of December 14, 1967, P. L. 813, effective January 1, 1969, the provision is cited in 72 P.S. §5348.

asserted that the property was in fact "omitted." Accordingly, the provisions of the statute relating to omissions and providing for a three year retroactivity are inapplicable to this case.

The appellants have cited numerous decisions for the proposition that omit does not mean, in this case, total absence from the tax rolls. They argue that even though the land was assessed, there was an omission with respect to the improvements. We do not subscribe to this view. The statute clearly differentiates between revision of existing assessments on the one hand and omissions on the other. The purpose of providing for revisions of existing assessments is to enable the local authorities to increase or decrease valuations as improvements to the property are made on a yearly basis. Furthermore, the cases cited by the appellants for the proposition that omit does not mean totally absent from the tax rolls are inapposite as they relate to statutes providing for triennial and interim-triennial assessments and revisions whereas we are here dealing with annual assessments.

The appellants' leading case, *Hammermill Paper Co. v. City of Erie,* 37 Erie Co. L. J. 18 (1952), *rev'd,* 372 Pa. 85, 92 A. 2d 422 (1952), *cert. denied,* 345 U.S. 940 (1953), illustrates this point. *Hammermill,* involving an interim-triennial revision, not an annual assessment, arose as the result of a 1948 Supreme Court of Pennsylvania decision holding that the valuation of industrial machinery should be included in the assessment. *United Laundries, Inc. v. Board of Property Assessment, Appeals and Review,* 359 Pa. 195, 58 A. 2d 833 (1948).

The city assessor in *Hammermill* made the interim assessment under the statutory authority of Section 2506 of the Third Class City Law, Act of June 23, 1931,

P. L. 932, 53 P.S. §37506, which states in pertinent part:

"He [the assessor] shall,

"(a) Assess any property which has been omitted, and correct any errors of law, fact or judgment. . . ."

It is again apparent that there is a distinction between "omissions" and "corrections of errors of law, fact or judgment." Omissions are not included within the meaning of errors of law, fact or judgment. The error in *Hammermill* was an error of law, not an omission. Furthermore, it is significant that in reversing the lower court in *Hammermill*, the Supreme Court found statutory sanction for the "interim" assessment as coming within this power to correct errors of law. The Court did not refer in its opinion to the assessor's power to assess "any property which has been omitted."

Other provisions of the controlling statute buttress our conclusion. Section 12 of the Act of June 26, 1931, P. L. 1379, as amended, 72 P.S. §5350c, states: "After the hearing of any objections thereto . . . the valuations . . . shall . . . stand . . . until changed at any subsequent annual assessment."

Also important are the provisions of Sections 9 and 18 of the Act, 72 P.S. §§5350, 5350i, relating to judicial review of assessments. Appeals from an assessment are available to the taxing authorities as well as to the taxpayer.

Since neither PECO nor the taxing authorities appealed from the annual assessments of 1965, 1966 and 1967 we conclude, in accord with the provisions of Section 12 of the Act, that the annual assessments were in fact final and thereafter were not subject to revision.

Having concluded that the retroactive revision of the annual assessments made by the Board for the years in question with respect to the recreational area are invalid under the applicable statutory law, we need not

reach the issue of whether the recreational area is essentially necessary to the project as having been required by the Federal Power Commission as a condition precedent to its licensing of the project.

The order of the court below is affirmed.