Blue Mountain Consolidated Water Company,
Appellant, *v.* Public Service Commission.

2 

Argued November 17, 1936. 

 Before
KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD,
PARKER, JAMES and RHODES, JJ. 

*Paul H. Rhoads* and *John Fox Weiss*, of *Weiss & Rhoads*, with them *Smith & Paff*, for appellant.

*Samuel Graff Miller*, with him *Harry H. Frank, John C. Kelley* and *Richard J. Beamish*, for appellee.

OPINION BY CUNNINGHAM, J., January 29, 1937:

The order now before us for review had its origin in a proceeding instituted by the commission upon its own motion. Having received information that the appellant water company "proposed to make certain changes in the interest rates of two outstanding bond issues," and being of opinion that these changes might "constitute the *issuance of securities*" within the meaning of Article III, Section 4(a) of the Public Service Company Law of July 26, 1913, P. L. 1374, as amended by Section 4 of the Act of June 3, 1933, P. L. 1526, 1530, 66 PS § 201-2, (Supplement), the commission issued a rule upon appellant to show cause why it should not obtain its approval before making the changes.

Appellant answered that its proposed reductions in interest rates would not "constitute the issuance of securities," within the intendment of the statute, and

moved that the rule be discharged. At the time fixed for a hearing the parties filed the agreed upon statement of facts, which appears in the reporter's notes; upon consideration thereof, the commission reached the conclusion that "any change in the interest rate" of either bond issue "will constitute an issue of bonds" and therefore cannot be made without the approval of the commission; the rule was made absolute and this appeal by the water company followed.

A majority of the members of this court are not convinced the legislature has clothed the commission with the power it here asserts. As we read the statement of facts, it is not quite accurate to say, as does the commission in its report, that the reduction in interest rates is to be accomplished by the "delivery of the bonds to the company by the owners, the substitution of the lower interest figure for the existing figure wherever it appears on the face of the bonds, and the return of the bonds to the owners"; nor that after the bonds have been stamped by the trustee, "the new bonds will be delivered to the public in consideration for their previous surrender of the old bonds."

It seems to us that the real question involved under the agreed-upon facts is whether a public service company may, without obtaining the approval of the commission, enter into contracts with the respective holders of its bonds providing for a reduction of the interest rate thereon—acceptance of such reduction to be evidenced by the holders producing their bonds to the trustee for the purpose of having the reduced rate stamped thereon.

The powers and limitations of public service companies, with respect to the issuing of stock and securities, are prescribed by Section 4 of the amendatory act of 1933, supra. The provisions upon which the commission based its order read:

"Upon the approval of the commission, evidenced

by its certificate of public convenience first had and obtained, and not otherwise, and upon compliance with existing laws, it shall be lawful for any public service company—

"(a). To issue stocks, trust certificates, bonds, notes, or other evidences of indebtedness or other securities, payable in periods of twelve months or more after the date thereof, and now or hereafter to be authorized, hereinafter collectively termed 'securities', in the manner prescribed by law, for and only for money, labor done, or money or property actually received, in accordance with the requirements of the Constitution and the laws of the Commonwealth.

"All stocks, trust certificates, bonds, notes, or other evidences of indebtedness or other securities, issued in violation of the requirements of the Constitution and the laws of the Commonwealth pertaining to the constitutional requirements, and all fictitious increases of stocks, trust certificates, bonds, notes, or other indebtedness or securities, shall be void.

"(d). Before issuing, disposing of, guaranteeing, or assuming liability on any securities, every public service company shall file with the commission an application, in such form as the commission may, from time to time, determine and prescribe; ...... and in determining whether to approve or disapprove an application for the issuance of securities, the commission is hereby authorized to regulate and control the character and amount thereof. ......"

In this case we need not inquire whether the term "issue", as used in the statute, is intended to apply only to the execution and authentication of bonds, as held in some cases, or also includes the delivery and putting of them into circulation, as decided in other instances. The term has been defined by the legislature itself in a paragraph added by the amendments

of 1933, (66 PS §1, Supplement) to Section 1 of Article I, of the original act, reading:

"For the purposes of this act, the terms 'to issue', 'issued', 'issuing' and 'issuance', when used herein in connection with securities, mean and refer to securities executed by proper corporate action and duly authenticated, irrespective of whether such securities are to be disposed of, or held in the treasury of the public service company." In this connection, it should also be noted that it is provided in paragraph (b) of Section 4 that it shall be lawful for any public service company, with approval of the commission, "To dispose of securities held in the treasury of the public service company: Provided, however, That such approval shall not be required in the case of securities so held that have been re-acquired after title has passed out of the public service company."

As we understand the plan proposed in the statement of facts, none of the bonds now outstanding will come into the ownership and treasury of the appellant company. The provisions relative to the calling for "purchase" of any bonds held by persons unwilling to enter into an agreement for the reduction of the interest, and the sale of such bonds to persons or institutions willing to enter into the same, are not necessarily an integral part of the reduction process itself; such bonds are to be resold before any change has been made in the interest rate. At most, they would be re-acquired bonds and within the proviso. Our difficulty is in seeing how the carrying out of the plan will amount to "issuing" bonds within the above quoted legislative definition of that term.

We agree with the commission that the primary purpose of the amendments of 1933 is to protect the public against the issuance of securities in excessive amounts or for unauthorized purposes, and that the maintenance of the solvency and credit of the utility is also one of

the purposes to be served. It is doubtless true that, as stated and illustrated by the commission in its report, the interest rate is a material factor in connection with the issuing or refunding by utility companies of their bonds. But in this case we are dealing with a reduction of the interest rate, which, if agreed to by the bondholders, will improve the credit of appellant.

In its report the commission, in justification of its order, remarked: "Where public service companies are financially mismanaged, the general public suffers. Each additional security issue, each variation in the interest rate of security issues, each change in maturity date, has its effect upon the ability of the company to serve the public. We feel that the legislature has placed upon this commission the duty to investigate all significant changes in the security structures of public service companies where such changes might adversely affect the public, and has conferred upon us the power to forbid changes not in the public interest. In our opinion, a variation in the interest rate of a security constitutes an important change in that security, and a change which might well be fraught with danger to the public."

If the bondholders of appellant are willing to relieve it of a part of its interest burden, we are unable to perceive any possible danger to its patrons.

It may be that it would be proper and wise for the legislature to give the commission jurisdiction over such contracts as are here involved. That is a question with which we have no concern. Our only duty is to determine whether it has done so. In performing that duty it must be kept in mind that the commission does not have jurisdiction over all contracts of a public service company, or over its entire financial management. In order to justify an exercise of authority it must be able to point to language in the statute which, without being interpreted in a forced or strained sense,

confers that authority upon it: *Bell Telephone Co. v. Pub. Ser. Com.*, 119 Pa. Superior Ct. 292, 181 A. 73; *Swarthmore Boro v. Pub. Ser. Com. et al.*, 277 Pa. 472, 478, 121 A. 488.

In our opinion, a reduction in the interest rate of outstanding bonds, accomplished by the method here outlined by appellant, would not constitute the "issuing of securities" within the common and ordinary meaning of those words as used in Section 4 of the amendatory act and the other sections to which reference has been made.

It is frankly stated by the commission that no other case "with facts wholly analogous to those here involved" has come before it since the approval of the amendments. As we understand the cases cited as having some bearing upon the question, there was in each of them some additional feature, such as an extension of the date of maturity, or a different method of procedure. Until the legislature has conferred upon the commission, in language more explicit than any to which our attention has been directed, the authority it seeks to exercise in this case we must hold that authority does not exist.

Order reversed and record remitted to the end that the rule may be discharged.