SECURITIES AND EXCHANGE COMMIS-
SION v. ASSOCIATED GAS & ELEC-
TRIC CO. et al.
No. 145.

Circuit Court of Appeals, Second Circuit.
Nov. 7, 1938.

Travis, Brownback & Paxton, of New York City (Charles M. Travis, Garrett A. Brownback, and Jesse J. Holland, all of New York City, of counsel), for defendants-appellants.

Chester T. Lane, of Washington, D. C. Gen. Counsel (Lewis M. Dabney, Jr., Milton V. Freeman, and David Ginsburg, all of Washington, D. C., of counsel), for Securities and Exchange Commission.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The Securities and Exchange Commission brought the above suit against Associated Gas & Electric Company, hereafter called the "company", to restrain it and other defendants from extending the maturity date of certain of its bonds of an issue known as "5½% Convertible Investment Certificates" maturing on November 15, 1938. During the years 1928 and 1929 approximately $31,000,000 at par of the Investment Certificates were issued and sold or otherwise disposed of. As a result of various reacquisitions and exchanges for other securities, the amount of the certificates outstanding in the hands of the public (exclusive of $144,800 which had been extended under previous proposals) had by January 26, 1938, been reduced to about $3,200,000. In order to conserve cash and to avoid refinancing the securities of a public utility holding company in difficult and uncertain times, the company on January 26, 1938, submitted to the holders of the certificates a proposal to pay off 20% of the principal coming due and to extend the maturity date of the balance either for one year or for five years from the date of maturity at the option of the holder. As an inducement to the holders to extend payment of their certificates for five years an additional interest advance of 2% was offered. Enclosed with the extension offer was a form of letter of transmittal addressed to the company's agent, to be filled out and signed by the holder agreeing to the particular extension elected, with authority to stamp such extension on his certificate. No change in the certificates was proposed other than the extension of the maturity date of the principal that was to remain unpaid, and the interest was to continue at the original rate of 5½% per annum. The extension was to be effected by stamping (by a rubber stamp) a legend on such certificates as were payable to bearer and affixing coupons for the extended period. The form of the legend to be stamped on registered certificates when extended for one year was as follows:

"Twenty per cent (20%) of the principal amount of this Certificate has heretofore been paid. The holder of this Certificate, for value received has agreed to the extension of the maturity of the unpaid portion of the principal hereof to November 15, 1939, to which each successive holder hereof is bound by the acceptance hereof. This Certificate shall continue to bear interest, payable quarterly, upon the unpaid portion of the principal hereof, at the rate of five and one-half per cent (5½%) per annum."

The legends stamped on certificates extended for five years, as well as on those in bearer form, were substantially the same.

At the time of the extension proposed the company was not a registered holding company under the Holding Company Act, 15 U.S.C.A. §§ 79–79z—6. It registered as such on March 29, 1938, but continued to make extensions without filing a declaration under Section 7 of the Holding

Company Act, 15 U.S.C.A. § 79g, because counsel advised that in their opinion an extension of the maturity did not constitute an issue or sale of a security within the meaning of Section 6(a) of that act, 15 U.S.C.A. § 79f(a), which reads as follows: "Sec. 6 [§ 79f]. (a) Except in accordance with a declaration under section 7 [section 79g] and with the order under such section permitting such declaration to become effective, it shall be unlawful for any registered holding company or subsidiary company thereof, by use of the mails or any means or instrumentality of interstate commerce, or otherwise, directly or indirectly (1) to issue or sell any security of such company; or (2) to exercise any privilege or right to alter the priorities, preferences, voting power, or other rights of the holders of an outstanding security of such company."

The term "issue" is not defined in the act, but in Section 2 (a) (23), 15 U.S.C.A. § 79b (a) (23), the word "sell" is defined thus: " 'Sale' or 'sell' includes any sale, disposition by lease, exchange or pledge, or other disposition."

█ Judge Clancy held in the court below that the securities evidenced by the stamped certificates delivered to the holders of the old certificates were "sold" within the meaning of Section 6(a) of the Holding Company Act, 15 U.S.C.A. § 79f(a), and made an order restraining the defendants pendente lite from "directly or indirectly extending the maturity date of any of the 5½% Convertible Investment Certificates of the Associated Gas and Electric Company to November 15, 1939, or to November 15, 1943, or to any other date by use of the mails or any means or instrumentality of interstate commerce, except in accordance with a declaration under Section 7 of the Public Utility Holding Company Act of 1935 and with the order under such section permitting such declaration to become effective, as required by Section 6(a) of such Act." The defendants have appealed from his order. In our opinion it should be affirmed.

█ If it had been proposed that the old certificates should be surrendered and that new securities having later maturity dates should be issued in their place it is not questioned that Section 6(a) (1), 15 U.S. C.A. § 79f(a) (1), would apply and a declaration under Section 7, 15 U.S.C.A. § 79g, and an order of the Commission would be necessary to render the new certificates lawful. The effect of the proposal under consideration would be identical. Why a stamp on the old certificates extending their maturity when accepted by the owner would not amount to the issue or sale of a security is hard to see. He would thereby surrender his right to have the certificate paid in full on November 15, 1938, and in place of it would receive 20% in cash and acquire the right to payment of the remaining 80% a year or five years later, instead of upon the original date. There would be a legal consideration for the new obligation and the fact that the same piece of paper would contain the earlier and the later obligation seems quite immaterial. To treat the proposed arrangement as beyond the jurisdiction of the Securities and Exchange Commission would seem to place form above substance and to defeat the statutory purpose of safeguarding the public interest by affording the means of investigating the merits of such transactions by the Commission so that issues of securities may be stopped if found inexpedient for the security-holders. There may be doubt about whether the security-holder will be as well off if he extends the date of payment and leaves his claim at the risk of the business for one or five years more as he would be if he insisted upon its present liquidation. He is in effect making a further investment and if the general policy of the act is sound he is entitled to have the guidance of the Commission as to its desirability. It is true that some of the risks, such as the priority of certain liens to his claim, may have been settled when he made his original investment but the continuance of it necessarily involves new dangers.

It is argued by the appellants that Section 12(e) of the Holding Company Act, 15 U.S.C.A. § 79l (e), gives sufficient supervision over arrangements to extend the maturity of securities without invoking the provisions of Section 6(a) and 7. Section 12(e) reads as follows: "(e) It shall be unlawful for any person to solicit or to permit the use of his or its name to solicit, by use of the mails or any means or instrumentality of interstate commerce, or otherwise, any proxy, power of attorney, consent, or authorization regarding any security of a registered holding company or a subsidiary company thereof in contravention of such rules and regulations or orders as the Commission deems necessary or appropriate in the public interest or for the protection

of investors or consumers or to prevent the circumvention of the provisions of this title or the rules, regulations, or orders thereunder."

■ It is reasonably plain from the text of Section 12(e) that it aims at regulating the solicitation of proxies. The House Committee stated the object of Section 12(e) thus: "Subsection (e) covers the solicitation of proxies in connection with all holding company and subsidiary company securities so that such solicitations will not afford the basis for subtle control adverse to the interests of investors who have a right to be kept fairly and properly informed by representatives of their own choosing." (H.R.Rep.No. 1318, 74th Cong., 1st Sess., p. 18).

We do not think it is obvious that Section 12(e) covers the substance of transactions affecting the extension of payment of securities. But if it should apply there would be no conflict between its provisions and those of Section 6(a). If its provisions became applicable through regulations adopted by the Commission to control the solicitation of consents or proxies they would only afford means of protecting security-holders in addition to those embraced in Section 6(a).

■ It is urged that the interpretation put by the Commission upon Section 12(f) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78l(f), as evidenced by Rule JF2 adopted thereunder is inconsistent with the interpretation which it has placed upon Section 6(a) of the Public Utility Holding Company Act of 1935. Rule JF2 continues the unlisted trading privileges of the owners of securities though the maturity, interest rate or amount of principal outstanding has been changed. But the fact that the Commission did not treat extended securities as new issues for the purpose of continuing trading privileges in no way involves the assumption that they should not be regarded as new sales or issues under Section 6(a) and 7(c) and (d). Continuance of the owner's trading privileges under Section 12(f) of the Securities Exchange Act, 15 U.S.C.A. § 78l(f), affords no reason for depriving him of the protection afforded by Section 6(a) in a case where need of protection is just as great as though the old security had been physically surrendered and a new one issued differing from the former only in maturity date.

In Blue Mountain Consolidated Water Company v. Pennsylvania Public Service Commission, 125 Pa.Super. 1, 189 A. 545, the Pennsylvania Superior Court held that the reduction of the interest rate of a security did not constitute the issuance of a new security but expressly distinguished the reduction of interest from the extension of the maturity date. Whatever might have been the opinion of that court about the effect of an extension we find no justification for disregarding the construction of Section 6(a) which the Securities and Exchange Commission has adopted. Any interpretation of the meaning of the words "issue or sell" other than the one adopted would involve a tenuous distinction between a new certificate, identical with the old except as to its maturity date, and an old one in which the maturity is extended by an inscription written on the original document. Such a distinction is most unreal and serves to defeat the declared purposes of the act.

■ The Interstate Commerce Commission has uniformly treated the extension of outstanding obligations as within Section 20a of the Interstate Commerce Act, 49 U.S. C.A. § 20a, and as involving an issue of securities which must have its approval. The long settled practice of that Commission in upholding its jurisdiction over securities, the maturity of which is extended, affords a persuasive analogy in support of the ruling of the Securities and Exchange Commission. Moreover, we are dealing with a new act the administration of which is the peculiar function of the Securities and Exchange Commission. One of the principal reasons for the creation of such a bureau is to secure the benefit of special knowledge acquired through continuous experience in a difficult and complicated field. Its interpretation of the act should control unless plainly erroneous. In no other way can the objects of the act be attained without constant and disconcerting friction. Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 77 L.Ed. 796. In view of the foregoing the decision of the court below seems to us to have been plainly correct.

Order affirmed.