York *v.* Public Utility Commission.

Argued May 5, 1971, before President Judge BOW-
MAN and Judges CRUMLISH, JR., KRAMER, WILKINSON,
JR., MANDERINO, MENCER and ROGERS.

*Spencer R. Liverant,* with him *Liverant, Senft & Cohen, George M. Elsesser, Jr., David W. Bupp,* City Solicitor, and *Jack H. Barton,* City Solicitor, for appellants.

*Walter L. Foulke,* Deputy Attorney General, with him *J. Shane Creamer,* Attorney General, for intervening appellant.

*Dominic J. Ferraro,* Assistant Counsel, with him *Edward Munce,* Acting Counsel, for appellee.

*Charles E. Thomas,* with him *Jack F. Aschinger, Metzger, Hafer, Keefer, Thomas & Wood,* and *Theodore F. Prophy,* for intervening appellees.

OPINION BY JUDGE MENCER, September 14, 1971:

In *Northern Pennsylvania Power Company v. Pennsylvania Public Utility Commission,* 333 Pa. 265, 5 A. 2d 133 (1939), it was held that a public utility company has the right to sell its property or to enter into a merger with another company, subject only to restraint if against the public interest. The Court in that case approved the concept that a public utility corporation may manage its own affairs to the fullest extent consistent with the protection of the public interest and that the Public Utility Commission may not function as a board of directors or managers to conduct and control the internal affairs of public service com-

panies but may intervene only to enforce reasonable rates and for accommodation and necessity.

On December 21, 1970 the Pennsylvania Public Utility Commission (Commission) filed an order approving a merger of three telephone companies, General Telephone Company of Pennsylvania (General), York Telephone and Telegraph Company (York Telephone) and Princeton Telephone Company (Princeton). The approval of this merger was in the face of protests of the City of York and the County of York and the said order of the Commission dismissed the complaints which those two governmental units had filed relative to the change of a $6,000,000 indebtedness of York Telephone. We hold that *Northern Pennsylvania Power Company v. Pennsylvania Public Utility Commission, supra,* controls here and therefore we affirm the order of the Commission which approved the merger and dismissed the complaints to the change of the indebtedness of York Telephone.

The order of the Commission was the culmination of proceedings that had their genesis in May 1966 when the three telephone companies filed applications for approval of a merger and the issuance of a certificate of public convenience to General as the surviving company to render telephone service in the areas previously served by the three telephone companies. The City of York and the County of York (appellants) filed protests to the merger applications and also complaints against York Telephone's intended change of indebtedness by the redemption of $6,000,000 in long term bonds and the substitution of bonds and debentures at a higher rate of interest. In August 1966 the telephone companies requested leave to withdraw the applications for merger since the protests filed would have made impossible the necessary refinancing of the entire three properties as part and parcel of General as scheduled. The

Commission granted the request to withdraw on October 24, 1966. In February 1967 the three telephone companies filed new merger applications to which the appellants also filed protests. Following considerable procedural skirmishing, hearings before the Commissioner's examiner were commenced on October 3, 1967. Following the initial hearings, appellants filed a petition for *subpoena duces tecum* to compel the telephone companies to produce various documents and records, including financial records from which certain of the financial data in the applications for merger were derived. After oral argument before the Commission, the petition was denied with leave to appellants to file an amended petition. Appellants did file an amended petition for *subpoena duces tecum* on August 9, 1968. By order, dated December 16, 1968, the Commission granted applicants' motion to dismiss the amended petition for *subpoena duces tecum*. However, it was pointed out in the Commission's order that at the request of the Commission a conference was held between a representative of the Commission, members of the Commission staff, and counsel for all parties to the proceedings which resulted in the telephone companies agreeing to make available to the appellants certain information requested in the amended petition for *subpoena duces tecum*. This information was supplied as agreed and it was made part of the record at the hearing held on March 5, 1969. The matter of the applications and complaints were briefed by the parties and argued before the Commission on June 24, 1969. The Commission, by its order of December 21, 1970, approved the merger and dismissed the complaints and this appeal followed.

We must first consider our scope of review. Whether this merger should be approved presents an administrative question for determination by the Commission

which must be left to the sound discretion of the Commission. Section 1107 of the Public Utility Law, Act of May 28, 1937, P. L. 1053, as amended, 66 P.S. 1437, provides: ". . . The order of the commission shall not be vacated or set aside, either in whole or in part, except for error of law or lack of evidence to support the finding, determination, or order of the commission, or violation, of constitutional rights. . . ." Section 1112 of the same Act, 66 P.S. 1442 provides: "Whenever the commission shall make any rule, regulation, finding, determination, or order under the provisions of this act, the same shall be prima facie evidence of the facts found. . . ."

Our authority to overrule an order of the Commission is limited. We may not disturb such an order except for errors of law, lack of evidence to support a finding, determination or order of the Commission, or violation of constitutional rights. *Clemmer v. Pennsylvania Public Utility Commission*, 207 Pa. Superior Ct. 388, 217 A. 2d 800 (1966). Likewise, we may not exercise our independent judgment on the record or resolve conflicting evidence. *Pittsburgh Railways Company v. Pennsylvania Public Utility Commission*, 198 Pa. Superior Ct. 415, 182 A. 2d 80 (1962). Our inquiry is directed to whether there is substantial evidence to support the Commission's action. *Pittsburgh & Lake Erie Railroad Co. v. Pennsylvania Public Utility Commission*, 170 Pa. Superior Ct. 411, 85 A. 2d 646 (1952). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Pennsylvania State Board of Medical Education and Licensure v. Schireson*, 360 Pa. 129, 61 A. 2d 343 (1948). Substantial evidence has also been said to mean evidence affording a substantial basis of fact from which the fact in issue can reasonably be inferred. Substantial evidence is synonymous

with competent and relevant evidence having a rational probative force. In *Philadelphia Suburban Water Company v. Pennsylvania Public Utility Commission,* 425 Pa. 501, 229 A. 2d 748 (1967), it was held that in view of Section 1107 of the Public Utility Law of 1937, the Pennsylvania Public Utility Commission's exercise of its discretion must be accepted by the courts unless its action is totally without support in the record, or is based on an error of law or is unconstitutional.

Appellants maintain that there is not substantial evidence in the record to support the Commission's order approving the merger. With this contention we do not agree.

In addition to the extensive corporate and financial information concerning the three telephone companies and their operations contained in the merger application and exhibits introduced into evidence at the hearings, there was the testimony of R. W. Britt, President and a director of all three telephone companies, and of John C. Herbert, Vice President and a director of the same three companies. Mr. Britt has been employed in responsible positions by various telephone companies for a period of over twenty years and Mr. Herbert had twenty-four years of service with York Telephone. He has been a Vice President of the three telephone companies in question since 1960.

Mr. Britt testified to the correctness of the facts set forth in the applications and as to the exhibits pertaining to the redemption of the preferred stock and first mortgage bonds of York Telephone.

Mr. Herbert testified that the merger would have no adverse effect on the customers of either General, York Telephone or Princeton, but rather there would be benefits to these customers. He testified that the merger would result in a stronger company; that investors will more likely be attracted to a larger company; that

service will be improved; that some paper work and overlapping administrative details in connection with the three companies would be eliminated; that business relations with other businesses and governmental agencies would be simplified. Further, he testified that the merger would be helpful in regard to labor relations and would be beneficial in the administration of tariffs, employee relations, saving of executive time and in producing economies in insurance costs. His testimony could fairly be summarized as a persuasive assertion that the merger will produce operating economies and regulatory simplification that should benefit all parties.

The Commission found and set forth in its order that "analogous to many mergers, the economies that would be forthcoming in this present merger are considerable. In view of the greater bargaining position that the surviving company General would have in obtaining needed capital in the money markets, and other comparative advantages, such as lower administrative costs, improved labor market conditions, and more importantly, the elimination of the other two corporate companies (York and Princeton), the beneficiaries of this merger will certainly be the subscribers of York and Princeton". We believe the evidence in the record supports these conclusions reached by the Commission and supports its order approving the merger.

One area of considerable disagreement arose relative to appellants' attempt to have issued a *subpoena duces tecum* by which they sought documents, memoranda, intercompany communications and writings in the records of the three telephone companies, covering 26 different subject matters relating to nine affiliated companies. The Commission denied the petitions for *subpoena duces tecum* and found as follows: ". . . Protestants have alleged that the subpoena duces tecum was

necessary for the proper evaluation of respondent's decision in taking action toward the refinancing of certain first mortgage bonds and preferred stock. Many of the documents sought were related solely to rate matters. By this criterion alone, i.e., involvement of rates, the denial of complainants' request for issuance of subpoena duces tecum was warranted in the absence of specific necessity therefor. The very nature of the request was admitted by protestants to establish the comparative rate disadvantage that might accrue to the York subscribers. . . . The commission's rules of practice, Rule 46, clearly requires a petition for subpoena duces tecum to state the specific documents and the necessity therefor. We are of the opinion that this petition for subpoena duces tecum was so broad in scope and void of specific necessity that an atmosphere of a 'fishing expedition' was inescapably created."

Our examination of the petition's request combined with the fact that this was a merger case and not a rate case satisfies us that the Commission was correct in denying the petitions for *subpoena duces tecum*. In *American Car & Foundry Company v. Alexandria Water Company*, 221 Pa. 529, 535, 70 A. 867, 869 (1908), it was stated: "Anything in the nature of a mere fishing expedition is not to be encouraged. Where the plaintiff will swear that some specific book contains material or important evidence, and sufficiently describes and identifies what he wants, it is proper that he should have it produced. But this does not entitle him to have brought in a mass of books and papers in order that he may search them through to gather evidence."

In *Annenberg v. Roberts*, 333 Pa. 203, 214, 2 A. 2d 612, 618 (1938), the Supreme Court said: "The subpoenas show on their face that they contemplate an

unreasonable search and seizure. They violate the principle which we announced in American Car & Foundry Co. v. Alexandria Water Co., 221 Pa. 529, where we held that a subpoena duces tecum could not properly be issued to bring in a mass of books and papers in order that there might be a search through them to gather evidence." These rulings were reaffirmed in *Stahl v. First Pennsylvania Banking and Trust Company,* 411 Pa. 121, 191 A. 2d 386 (1963).

We also conclude, after examination of the record, that appellants were not denied any rights to a fair hearing. Nor do we believe that Section 601 of the Act of May 28, 1937, P. L. 1053, art. VI, 66 P.S. §1241, has been violated by the redemption of York Telephone securities which were outstanding prior to filing of any merger applications. Section 601 provides as follows: "(a) Under such regulations as the commission may prescribe, every public utility, before it shall execute, cause to be authenticated, deliver, or make any change or extension in any term, condition, or date of, any stock certificate, or other evidence of equitable interest, or any bond, note, trust certificate, or other evidence of indebtedness of itself, any or all of which acts are hereinafter included in the term 'issuance of securities,' shall have filed with the commission, and shall have received from the commission, notice of registration of a document to be known as a securities certificate. . . ."

The redemption of outstanding securities, in accordance with their terms, does not constitute an "issuance of securities" requiring the filing and registration of a securities certificate. *See Bell Telephone Company of Pennsylvania v. Public Service Commission,* 119 Pa. Superior Ct. 292, 181 A. 73 (1935) ; *Blue Mountain Consolidated Water Company v. Public Service Commission,* 125 Pa. Superior Ct. 1, 189 A. 545 (1937).

In *Northern Pennsylvania Power Company v. Pennsylvania Public Utility Commission, supra,* the following fundamental principles of law governing merger proceedings in the case of public utilities were established: (1) The free alienation of property is an inherent right of the owner under our customs, laws and constitutions, subject only to restraint if against the public interest; (2) the Public Utility Commission is not a super board of directors for the public utility companies of the State and it has no right of management of them; (3) the sole power of the Commission is to see that in the matter of rates, service and facilities their treatment of the public is fair; and (4) the only question before the Commission is whether the merger would adversely affect the public and where the testimony establishes that the merger would not adversely affect the public interest the power of the Commission over the merger vanishes.

Applying these fundamental principles, and after a careful reading of the record and the opinion of the Commission, our conclusion is that the Commission was correct in approving the merger and finding that such merger would not be adverse to the public interest. Like the instant case, the *Northern Pennsylvania Power Company* case involved companies whose territories were not physically connected, not contiguous, not equally populated, and so different in character as not readily susceptible of rate unification. The question of rates after the merger is for the determination of the Commission, which has the power and responsibility to see that just and reasonable rates are fixed. Equally applicable here is what Mr. Justice SCHAFFER said in *Northern Pennsylvania Power Company* at page 270 of 333 Pa.: "There is no intention to increase the rates and the rate payers in this respect will be in the same position that they now are. Whether the two com-

panies merge into one or function separately, the policies pursued in the matter of rates and service and accounting would still be subject to the regulation of the commission." The Commission undoubtedly had this in mind when in the instant case it specifically required, as a part of its approval order, that General maintain separate operating records for the respective service areas of the former York Telephone and Princeton in all matters, including accounting, service, and rates. It is also significant that no increase in rates was proposed in connection with the merger here.

Finally, there remains the question of the right of the Attorney General to intervene on behalf of the Commonwealth of Pennsylvania as an appellant in this appeal. This case had been scheduled for argument on May 5, 1971, and on May 3, 1971, the Attorney General filed his petition to intervene. Argument on the merits of the appeal was heard on May 5, 1971, since no continuance had been sought, and the Attorney General was permitted to argue on the merits of the appeal with the understanding that a hearing on the petition to intervene would be subsequently held and, if the petition to intervene were dismissed, the Attorney General's argument on the merits would be disregarded. Hearing on the petition to intervene was held on June 1, 1971.

The Attorney General relies upon the Act of May 28, 1915, P. L. 616, §1, as amended, 12 P.S. §145, as the basis for his right to intervene in this case. This section reads as follows: "In all cases at law or in equity, in any court or before any officer, board, commission, or other body having jurisdiction of the matter, in which the Commonwealth or any officer thereof may be a party, or in which the Commonwealth may have any interest, the Commonwealth shall have the right to intervene, and to appear, plead, prosecute, defend, or appeal, as other parties litigant; but in no case shall

be required to give any bond or other security for costs or for any other purpose whatever."

Under this statute, the only basis upon which the Attorney General could intervene would be that part of the statute which reads, "in which the Commonwealth may have any interest". It is the Attorney General's position that the present merger proceeding before the Commission is cloaked with a public interest.

Intervention under the Act of 1915 is not a matter of right. In *Mellon's Estate*, 347 Pa. 520, 527, 32 A. 2d 749, 753 (1943), Mr. Justice ALLEN M. STEARNE said: "We do not accept the contention of the Commonwealth that this statute was designed to permit the Commonwealth to intervene at pleasure in any suit between third parties in which it claims an interest regardless of how remote, incidental or indirect such interest may be. This construction would authorize intervention by the Commonwealth in any proceeding upon the mere declaration of its officer or agent that it had an interest. We have held that the section has no such effect. See Cameron v. City Bank of York, 284 Pa. 187." We believe that the Commonwealth has no real interest in this case except through the Public Utility Commission, its duly constituted and peculiarly qualified agency, which is charged with the duty to conduct the proceedings and issue an order.

However, more fatal to the Attorney General's position here is the statutory duty that he has to represent the Public Utility Commission and to be allowed to intervene would create an irreconcilable conflict of interest. We are in full accord with what Judge WOODSIDE said in *Ault Unemployment Compensation Case*, 188 Pa. Superior Ct. 260, 146 A. 2d 729 n.1 (1958): "The Attorney General appeared personally before us and argued this and companion cases in favor of the claimants and *against* the Unemployment Compensation

Board. We are of the opinion that he should not have argued *against* an agency of the Commonwealth which the legislature directed him to represent in litigation. See section 903(b) of The Administrative Code of April 9, 1929, P. L. 177, 71 PS §293.

"The attorney general is charged by The Administrative Code with the duty of not only representing the boards and commissions in court but also of giving them legal advice. See Section 902, 71 PS §292 and section 512, 71 PS §192. However, within their respective fields these boards and commissions are given authority to make decisions which involve not only findings of fact, but also conclusions of law. They must determine the law applicable to the facts of the cases before them. As we view it, the legislature did not intend that the attorney general should examine each case before these quasi-judicial bodies to determine how he thinks the board or commission should decide them. The legislature provided for the review of these decisions by courts to which appeals are allowed. Appeals from these decisions are not to the attorney general.

"This brings us to the question of what the attorney general should do when he personally believes the decision of such board or commission is erroneous. The legislature directs the attorney general to represent the board or commission before the court. He cannot carry out this duty if he substitutes his own personal views of the law for the board's decision. On the other hand, we recognize that a lawyer may have such strong convictions concerning a legal principle that he feels he can, in good conscience, argue only one position to the court.

. . . .

"We do not question the attorney general's motives. He undoubtedly did what he conceived to be his duty as an officer of the Commonwealth and of this Court. Furthermore, we recognize that the duties of an attor-

ney general cannot always be measured by the same yard-stick used to measure the duties of private counsel. There are occasions where an attorney general is required to represent both sides of a case, as, for example, when the Highway Department appeals from a Public Utility Commission order. In such cases he cannot believe both sides to be right, and yet he is charged by statute with presenting both sides to the court. This, of course, is done through deputies or counsel assigned to the agencies involved, but inasmuch as all of these represent the attorney general himself, the attorney general is on both sides of the case.

"It has been suggested that an attorney general should never be on both sides of a case. Legal disputes between departments or even between a department and a board or commission *involving administrative problems* should be, and are, settled by the opinions of the attorney general, which as to such agencies have the effect of law. An attorney general has no problem in determining his duty as to these matters. His soul-searching is induced by the problems that arise out of the decisions of the quasi-judicial boards and commissions. Here he may frequently disagree with the decisions of these boards and commissions, and yet under the law which he must administer with fidelity, he is charged with the duty of representing them in court. These boards and commissions are not in the category of ordinary lay clients, but are quasi-judicial bodies, more nearly in the category of courts, and therefore not as directly subject to the legal advice of their lawyer as are lay clients."

If intervention would be permitted, counsel for the Commission would be placed in a position of having a statutory duty of defending an order of the Commission while at the same time being controlled and directed by the Attorney General who is advocating a position

directly opposite to the order of the Commission. The Act of March 31, 1937, P. L. 160, §9, 66 P.S. §460, reads as follows: "The office of counsel to the Pennsylvania Public Utility Commission is hereby created, such counsel to be appointed by the Attorney General, with the approval of the Governor. The Attorney General may also from time to time, with the approval of the Governor, appoint such assistant counsel to the Pennsylvania Public Utility Commission as may be required for the proper conduct of its work. The compensation of the counsel and assistant counsel of the Pennsylvania Public Utility Commission shall be fixed by the commission, with the approval of the Governor. Such counsel or assistant counsel shall attend the hearings before the commission or a commissioner, or a special agent or examiner, and conduct the examination of witnesses when requested so to do by the Commission or a commissioner, and shall represent the commission upon appeals and other hearings in the courts of common pleas and in the Superior and Supreme Courts, or other courts of the Commonwealth of Pennsylvania, or in any Federal court, and in actions instituted to recover penalties and to enforce regulations and orders of the commission. Such counsel and assistant counsel shall also assist the Attorney General in conducting all mandamus, injunction, and quo warranto proceedings at law or in equity, instituted by him for the enforcement of the regulations and orders of the commission, and shall perform such other professional duties as may be required of them by the commission."

Since the Attorney General has the power to appoint counsel for the Commission, he likewise has the power to remove such counsel.[1] If the Attorney Gen-

---

[1] In the exercise of this power it follows that the Attorney General could insure effective representation for the Public Utility Commission consistent with his viewpoints.

eral were permitted to intervene in opposition to the Commission's order, and as an opposing advocate to the counsel for the Commission, who is subject to removal by the Attorney General, then the Commission would be denied the effective representation of counsel to which it is entitled by statute. We cannot sanction such an irreconcilable conflict of interest.

Section 1104 of the Public Utility Law, 66 P.S. §1434, provides as to parties on appeal: "In any appeal to the Superior Court,[2] the court may order the complainant in the original complaint to be added to the record as a party, and such party shall be permitted to join in the defense of the order of the commission at issue. The court may also, upon application by petition and cause shown, permit any person, corporation, or municipal corporation to intervene in such proceedings and be added as a party appellant or appellee therein. Notice of such application to intervene shall be served upon the commission within three days of the filing of such application."

The definitions of "person", "corporation" and "municipal corporation" under Section 2 of the Public Utility Law, 66 P.S. §1102, do not include the Commonwealth which therefore does not qualify for intervention under said Section 1104. The Public Utility Law provides a comprehensive and exclusive system of regulation for utilities and the prescribed procedure for appeal must be followed. In *George Hyam Associates, Inc. v. Pennsylvania Public Utility Commission*, 199 Pa. Superior Ct. 3, 6, 184 A. 2d 414, 415 (1962), the Superior Court said: "The right of appeal in public utility proceedings is necessarily statutory and the con-

---

[2] Appeal is now to the Commonwealth Court. Act of July 31, 1970, P. L.    , No. 223, art. IV, §403(1), 17 P.S. §211.403(1) (footnote added).

ditions under which this right may be exercised are to be found in the provisions of the law for such appeals. Franke v. Johnstown Fuel Supply Company, 70 Pa. Superior Ct. 446, 451, 452; Al Zeffiro Transfer and Storage Company v. Pennsylvania Public Utility Commission, 195 Pa. Superior Ct. 214, 217, 171 A. 2d 800. The prescribed procedure must be strictly pursued. Smith v. Scholl, 262 Pa. 124, 127, 105 A. 41; Colteryahn Sanitary Dairy v. Milk Control Commission, supra, 332 Pa. 15, 23, 24, 1 A. 2d 775; Oteri Appeal, 372 Pa. 557, 561, 94 A. 2d 772. This is particularly true of special statutory appeals from action of administrative bodies. Blank v. Board of Adjustment, 390 Pa. 636, 640, 136 A. 2d 695."

We conclude that the appeal and review provisions of the Public Utility Law do not provide for intervention by the Commonwealth; further, that these provisions prevail over the provisions of the Act of May 28, 1915, as amended, upon which the Attorney General relies for intervention in this case. *See* Act of May 28, 1937, P. L. 1019, art. VII, §91, 46 P.S. 591.

Accordingly, the motion of General Telephone Company of Pennsylvania, York Telephone and Telegraph Company and Princeton Telephone Company to deny the petition of the Attorney General to intervene on behalf of the Commonwealth of Pennsylvania is hereby granted. Further, we conclude that the Public Utility Commission did not abuse its discretion in approving the merger of the three telephone companies, parties to this suit. Its order of December 21, 1970 is supported by the record and is not in violation of the law or any constitutional rights.

Order affirmed. Petition of the Attorney General to intervene is hereby dismissed.

Judge MANDERINO dissents.

OPINION BY JUDGE WILKINSON CONCURRING IN PART AND DISSENTING IN PART:

I concur with the majority of the Court when it holds that the Pennsylvania Public Utility Commission did not abuse its discretion in approving the merger of three telephone companies, parties to this suit. However, I must respectfully dissent from the dismissal of the petition of the Attorney General to intervene. I would allow such intervention.

Section 9 of the Public Utility Law, Act of March 31, 1937, P. L. 160, 66 P.S. 460, specifically creates the office of counsel to the Pennsylvania Public Utility Commission. As indicated by the majority, such counsel is appointed by the Attorney General, with the approval of the Governor, and is compensated at a rate fixed by the Commission, with the approval of the Governor. Clearly, he is not a deputy attorney general. The same section of the Act, wherein it provides for his duties, sets forth: "Such counsel and assistant counsel shall also assist the Attorney General in conducting all mandamus, injunction, and quo warranto proceedings at law or in equity, instituted by him for the enforcement of the regulations and orders of the Commission, and shall perform such other professional duties *as may be required by the Commission.*" (Emphasis supplied.)

It seems clear to me that this language makes the office of counsel to the Pennsylvania Public Utility Commission a completely independent office from the Attorney General with the requirement that he "assist" the Attorney General in the very restricted area when the Attorney General is enforcing the regulations and orders of the Commission.

In Section 906 of the Administrative Code, authority is provided for the Attorney General, with the approval of the Governor, to appoint and fix the com-

pensation of such special deputy attorneys general as may be required for the departments, boards and commissions which may require such services, but specifically provides that the office of counsel to the Pennsylvania Public Utility Commission *shall be retained.* See Section 906 of the Act of April 9, 1929, P. L. 177, as amended December 17, 1970, P. L.    , 71 P.S. 296. Any possible doubt as to the independent status of the counsel to the Pennsylvania Public Utility Commission would seem to be removed by this legislation, especially so recently amended.  If it is decided, as I would decide, that the counsel for the Pennsylvania Public Utility Commission is independent of the control of the Attorney General, then it would seem to follow that the Attorney General could intervene in any proceedings either before the Commission or on appeal from the Commission under his broad powers of intervention given in the Act of May 28, 1915, P. L. 616, Section 1, 12 P.S. 145.

The question of whether the Attorney General can dismiss the counsel to the Pennsylvania Public Utility Commission is not before this Court and I would not express dictum on it.

----

Opinion by Judge Kramer (Concurring in Part and Dissenting in Part) :

I join in the dissenting part of the opinion written by Judge Wilkinson insofar as it applies to the petition of the Attorney General to intervene. I, too, would hold that the Attorney General should have been permitted to intervene for the same reasons stated by Judge Wilkinson.

I must register my dismay for the unexplained, extremely long delay by the Pennsylvania Public Utility Commission in completing these proceedings before it. The record fails to disclose why over forty-six months

were consumed in arriving at an adjudication, twenty-one months of which delayed time followed the last hearings before the Commission. Such procrastination is not fair to anyone, the public or the regulated. One of the very purposes of utilizing the administrative law approach to government regulation is expedition. That purpose failed in this case.

After a careful reading of the entire voluminous record in this case, this writer cannot conclude that the PUC committed an abuse of discretion or an error of law. Although this writer is deeply concerned with the possibility that the rate payers in the York area may be put to a disadvantage in a rate case involving the merged companies, the PUC has adequately conditioned its order so as to provide a reasonable safeguard through an adequate segregation of records. The PUC's statements in its adjudication concerning the absence of a pending, or imminent, rate increase are meaningless in light of the fact that the statute permits a rate increase after only sixty days from the date of the filing for same (53 P.S. 1148). Even the representations made to this Court by these telephone companies that there is no intent to present a consolidated cost of service rate case after the approval of this requested merger is not binding. But, there runs throughout the rate-making process a theme of fairness which will be present like a beacon in any future rate case of the merged company, at which the appellants will be given their full day in court on the subject of the fairness of rates.

I concur with the majority that *Northern Pennsylvania Power Company v. Pennsylvania PUC,* 333 Pa. 265, 5 A. 2d 133 (1939) controls this aspect of this case. Based upon the opinion of the majority, I concur in the result, to the end that the order of the PUC approving the merger of these three telephone companies should be affirmed.