## Clemmer et al., Appellants, *v.* Pennsylvania Public Utility Commission.

Argued December 17, 1965.   Before ERVIN, P. J.,
WRIGHT, WATKINS, MONTGOMERY, JACOBS, and HOFF-
MAN, JJ. (FLOOD, J., absent).

*Fred T. Cadmus, III,* for appellants.

*Theodore O. Rogers,* for County of Chester, intervenor-appellant.

*Anthony L. Marino,* Assistant Counsel, with him *Joseph C. Bruno,* Chief Counsel, for Pennsylvania Public Utility Commission, appellee.

*Samuel Graff Miller,* with him *Donald Blanken, Edwin W. Scott* and *Vincent P. McDevitt,* for intervenor-appellee.

OPINION BY MONTGOMERY, J., March 24, 1966:

These appeals are from orders of the Pennsylvania Public Utility Commission (Commission) granting to the Philadelphia Electric Company (Company) certificates of public convenience to permit condemnation of

easements over lands in Chester County, Pennsylvania. The orders are based on applications filed by the Company for authority to erect a 500 KV aerial power line from Peach Bottom, located on the Susquehanna River in York County, to Whitpain, Montgomery County, by a route through Chester County. The project is part of a power grid arrangement involving other electric companies in Pennsylvania, New Jersey and Maryland.[1]

The Company owns another three hundred fifteen (315) foot right of way through Chester County known as Conowingo Right of Way, which appellants contend is adequate for the purposes for which the Company alleges it needs the new right of way.

The instant appeals involve approximately three and six tenth miles of a total of 45 miles more or less of necessary easements within Chester County. The entire length of the proposed 500 KV line through Chester, Montgomery, York and Lancaster Counties is 83 miles. The easement rights over 82.8 per cent of the properties along this proposed 83 mile line have already been acquired by the Company.

---

[1] This is part of the Keystone Project consisting of two 900,000 KV steam-electric turbine generators being constructed in the bituminous coal regions of western Pennsylvania in Armstrong County which are connected by more than 600 miles of 500 KV transmission lines with a power pool for Pennsylvania, New Jersey and Maryland and operated through six substations. The project has participation by the Atlantic City Electric Company, Baltimore Gas and Electric Company, Delaware Power and Light Company, Jersey Central Power and Light Company, Pennsylvania Power and Light Company, Public Service Electric and Gas Company, and the intervening appellee, the Philadelphia Electric Company. This pool in turn is connected with other pools with service connections extending west to the Rocky Mountains, south to the Gulf of Mexico and north through New York State into northeastern United States and Canada. The purpose of this arrangement is to give an unrestricted interchange of electrical energy so as to provide to the public dependable, economical service. Eventually it will be a major tie-in for the Middle Atlantic region of the United States.

The properties involved in these appeals are those of Richard I. Clemmer et ux. (No. 63), Otis A. Astle et ux. (No. 64), A. Lewis Trego et ux. (No. 66), Sterling O. Warner et ux. (No. 67), Howard S. Rue et ux. (No. 79), W. H. Dunwoody Zook et ux. (No. 81), John S. Kean et ux. (No. 84), Samuel W. Morris et ux. (No. 85), and William H. Brower et ux. (No. 89).

The County of Chester has been granted permission to intervene as an appellant in the cases of Clemmer (No. 63), Astle (No. 64), and Morris (No. 85), and has also filed separate appeals from the orders affecting Clemmer and Astle, its Clemmer case appeal being No. 71 and the Astle No. 70. In two other cases affecting properties of Nathan M. Clark and the Janaline Realty Company in which the county had intervened in the proceedings before the Commission, as it had done also in Clemmer and Astle, the county took appeals at Nos. 69 and 72, although the property owners Clark and Janaline did not appeal. We have refused a motion of the Company to dismiss the separate appeals by the county and shall consider them as part of this consolidated appeal since the issues are common to all cases and the parties have stipulated that all appeals shall be disposed of in accordance with our disposition of Appeals Nos. 63, 64, 70 and 71. The Company is an intervening appellee in all cases.

The basic issue is whether the record contains sufficient evidence to support the Commission's finding that the service proposed to be furnished by the Company through the proposed facilities is necessary or proper for the service, accommodation, convenience or safety of the public; and in making such finding, whether the Commission unreasonably disregarded the rights of appellant landowners or the County of Chester.

Aside from the contention that the present existing Conowingo easement is adequate to accommodate the

new 500 KV line, the county also complains that the certificate granted an easement of greater width than is required by the Company's present needs for the proposed new line. The appellants also argue that the Commission failed to take into consideration aesthetic factors and the inconvenience the county will suffer by the disruption of existing and planned public facilities, i.e., a planned 700 acre park, planned flood control and water conservation facilities.

They also contend that the Commission made no findings of fact to support its orders. This last contention is without merit. Although the various orders of the Commission do not set forth its findings seriatim, each one does contain the necessary supporting findings made by the Commission. In each order it is expressly stated that, "Upon full consideration of all matters of record, the Commission finds that the service to be furnished by Philadelphia Electric Company through its proposed exercise of the power of eminent domain, under the provisions of the Act of Assembly, approved May 21, 1921, P. L. 1057, 15 P.S. 1182, is necessary or proper for the service, accommodation, convenience, or safety of the public, and that a certificate to that effect should issue . . ." Furthermore, Section 1005 of the Public Utility Law, the Act of May 28, 1937, P. L. 1053, 66 P.S. §1395, providing that orders of the Commission must be supported by sufficient findings, is in reality for the benefit of the reviewing court and any complaint as to noncompliance should come from it. *Department of Highways v. Pennsylvania Public Utility Commission*, 189 Pa. Superior Ct. 111, 149 A. 2d 552 (1959).

The authority of this Court to overrule an order of the Commission is limited. We may not disturb such an order except for errors of law, lack of evidence to support a finding, determination or order of the Commission, or violation of constitutional rights, Section

1107 of the Public Utility Law, 66 P.S. §1437; *Pennsylvania Railroad Company v. Pennsylvania Public Utility Commission*, 202 Pa. Superior Ct. 114, 195 A. 2d. 162 (1963); and we may not exercise our independent judgment on the record or resolve conflicting evidence. *Gradison Auto-Bus Company, Inc. v. Pennsylvania Public Utility Commission*, 199 Pa. Superior Ct. 303, 184 A. 2d 334 (1962); *Pittsburgh Railways Company v. Pennsylvania Public Utility Commission*, 198 Pa. Superior Ct. 415, 182 A. 2d 80 (1962).

Our review of this record compels us to affirm the orders of the Commission since they are supported by sufficient competent evidence and we find no error of law or violation of any constitutional rights of the several parties.[1(a)]

The need for the new 500 KV transmission line being conceded, the issue is limited to that relating to the route it should follow. The old Conowingo Right of Way is already occupied by two 230 KV lines and there is evidence to establish that a third line of similar capacity will be needed within a reasonably short time. In addition, for a distance of approximately two-and-one-half miles at the northeasterly end of this easement, within Chester County adjacent to Plymouth Meeting substation, it is fully occupied by lines and ground installations for the transmission of electrical energy. This condition would necessitate by-passing this area and the condemnation of additional land or easements to accommodate a new line if the Cono-

---

[1(a)] Unlike *Scenic Hudson Preservation Conference v. Federal Power Commission and Consolidated Edison Company of New York, Inc.*, 354 F. 2d 608 (2d Cir. 1965), wherein the Federal Power Commission ignored certain relevant factors and failed to make a thorough study of possible alternatives, the Public Utility Commission, in the present case, made a thorough study of the only alternative that was suggested by appellants or otherwise appears as a possible one.

wingo easement were to be utilized for the new 500 KV line.

It is the contention of the appellants supported by their expert witness, Mr. Alexander Lurkis, that the Conowingo easement is adequate and may be utilized in several ways to accommodate the new line. This expert says these several alternatives are more economical than the plan proposed by the Company. The alternatives suggested by Mr. Lurkis are briefly described as follows:

(a) Raise the voltage of the two existing 230 KV lines and substitute towers that carry two circuits rather than one.

(b) Install a 500 KV tower between the two 230 KV towers now erected thereon and place the 500 KV line at a higher elevation sufficient to give a 40 foot clearance between the 500 KV line and the two 230 KV lines. Recognizing the problem existing near Plymouth Meeting substation in the use of this alternative he recommends the acquisition of a new right of way between the Conowingo easement and the railroad which runs parallel to it at this point, as a by-pass.

(c) Permit one 230 KV tower to remain temporarily while rebuilding the other 230 KV tower to accommodate two vertical configurations of conductors to carry two 230 KV lines. After both are established then remove the 230 KV line on the other tower and replace it with the new 500 KV line, by-passing Plymouth Meeting substation in the same manner as suggested in (b).

(d) This suggestion is similar to (c), except instead of running a vertical configuration of conductors, run a series of conductors on a parallel. This would avoid a common objection to the vertical configuration which is frequently made because of the risk of the higher line falling and by striking the lower line knocking out both circuits.

(e) Construct part of the 230 KV line underground for 25 miles from a point south of Allentown to Whitpain and utilize the space on the Conowingo easement vacated by that part of the 230 KV line for the construction of the 500 KV line.

Numerous reasons were stated by Mr. Shew, the Company's chief electrical engineer, for rejecting the above suggestions made by Mr. Lurkis. Mr. Shew testified that the 230 KV tower could not be relocated economically, and if relocated would result in the lines being out of service for a long time during which many communities would be greatly inconvenienced; that it would take from ten to twelve months to replace an existing line with a twin circuit line; that two alternate supply lines on the same tower is an unacceptable operating condition resulting in poor reliability; that the Keystone project would be delayed two years if these suggestions were adopted, resulting in a deficiency of service to the entire Pennsylvania, New Jersey and Maryland interconnection for an extended period of time; that any available space on the Conowingo easement was inadequate for a 500 KV line and furthermore, the space was required for another 230 KV line to be constructed in the near future; that there is no practical way to construct a 500 KV line across or around Plymouth Meeting substation property; and finally, that an independent route for the new 500 KV line is required for reliability reasons.

There is a great deal of engineering detail in this record in support of each contention and to depreciate the opinion of each expert. However, as previously stated, the credibility of the witnesses and the weight of the testimony is for the Commission, which we believe is well qualified by years of experience in this field to determine the true facts and arrive at the proper conclusion. As we view the record in the light of other obvious facts within our personal knowledge,

such as the continuous expansion of our economy, the explosion in our population, and the possible failure of power with the disastrous results that it produces, as recently suffered by northeastern United States, we are not prepared to say that the Commission erred in concluding that an independent route was necessary for the new 500 KV line, rather than the utilization of the old Conowingo route.

No other route except the Conowingo one having been suggested by appellants, we need direct our attention only to the new route proposed by the Company after many months of study. At the outset it is noted that whenever it was possible to use an existing easement a new one was not requested, i.e., from Peach Bottom to Nottingham substation through Lancaster and part of Chester County an existing right of way was used. It is also noted that the terminals of the new line had been fixed at (1) a point in the territorial boundary line between Lower Chanceford and Chanceford Townships in York County, Pennsylvania, where the Company's portion of the line would meet that of the Metropolitan Edison Company; (2) the Peach Bottom plant site in Peach Bottom Township, York County, Pennsylvania; and (3) the Whitpain substation in Whitpain Township, Montgomery County, Pennsylvania.

The individual appellant's objections to the new route are common objections in cases of this nature, i.e., (a) the landscape is changed and woodland is destroyed; (b) the location causes unreasonable damage to property rights. As to objection (a) there is nothing in the record indicating this change is greater or more damaging in Chester County than generally occurs elsewhere. As to (b), the record shows that the new easement is located in the rear of appellants' buildings and a considerable distance therefrom. We note that their briefs omit reference to any objection

to the route for reasons concerning the particular property of any one of the individual appellants, except as to the width of the easement which is said to be excessively wide, 300 feet rather than 200 feet.

It is the County of Chester that advances the more serious arguments. We have given our answer to its objection for aesthetic reasons. Its second objection relates to the possible lost revenue from taxes. This is a debatable objection and this record falls short of convincing us that such a result will follow. However, if it does, the fact that a political subdivision is deprived of possible tax revenue has never been considered controlling in eminent domain proceedings. *Willits v. Pennsylvania Public Utility Commission*, 183 Pa. Superior Ct. 62, 128 A. 2d 105 (1956), cert. denied, 355 U.S. 11, 78 S. Ct. 14, 2 L. Ed. 2d 20.

The county also objects because of the possible effect the new line will have on its plans for a 700 acre park and a lake or reservoir for flood control and water conservation, neither project having been started. We are not convinced, nor was the Commission, that either the construction of the overhead lines or the towers will cause undue inconvenience or interference with the county's plans. It would be to the advantage of the Company as well as the county for such construction to be planned in a manner to cause the least interference with the aforesaid plans of the county. In what manner the line should be constructed in this area, overhead or underground as suggested for the Conowingo easement by-pass, is a matter for future study and decision.

The fact that these overhead lines and towers are to be constructed within one-and-six-tenths miles from the county airport, possibly two miles from the runway, and approximately the same distance from the airport beacon, gives us some concern since this is an airport used by small aircraft whose operators are not

all of the utmost experience. However, safety require-
ments will have to be met by the Company in the erec-
tion of its lines and we believe that the Commission
also properly left this feature of the case for future
consideration.[2]

This brings us to appellants' final objection relat-
ing to the excessive width of the easement. There is
testimony that in the year 1970 another 500 KV line
will be required over this easement. The Commission
was convinced by the evidence that this was true. In
cases of this nature a liberal consideration for the fu-
ture as well as existing necessities is the test. *Truitt
v. Borough of Ambridge Water Authority*, 389 Pa. 429,
133 A. 2d 797 (1957); *Pittsburgh, Ft. Wayne & Chi-
cago Ry. v. Peet*, 152 Pa. 488, 25 A. 612 (1893); *Appeal
of Pittsburgh Junction R. Co.*, 122 Pa. 511, 6 A. 564
(1886). In view of the law, the record, and our own
observations previously stated, we cannot declare the
Commission in error for approving the easement at the
full width of 300 feet. The argument advanced by
appellants to the effect that the Company can secure
the easement at a lower value at this time than it may
be able to do so later has no substantial merit. The
future worth of its present payment of damages for
the additional width should also be greater at a later
date if properly invested.

Our final conclusion is that the Commission did not
abuse its discretion in granting the Philadelphia Elec-
tric Company the easement rights hereinbefore dis-
cussed. Its orders are supported by the record and are

---

[2] See *Postal Telegraph-Cable Co. v. Pennsylvania Public Utili-
ty Commission*, 154 Pa. Superior Ct. 340, 35 A. 2d 535 (1944), as
to the authority of the Commission to safeguard the rights of the
public in the construction of the system; also see the Airport Zon-
ing Act of April 17, 1945, P. L. 237, 2 P.S. §1550 et seq., for means
the County of Chester may take to assure safety at its airport.

400

not in violation of the law or any constitutional rights of the appellants.

All orders affirmed.