Allegheny Center Associates, Appellant, *v.*
Pennsylvania Public Utility
Commission.

Argued November 17, 1966. Before ERVIN, P. J., WRIGHT, WATKINS, MONTGOMERY, JACOBS, HOFFMAN, and SPAULDING, JJ.

*Frank L. Seamans,* with him *William H. Pentz,* and *Eckert, Seamans & Cherin,* for appellant.

*Daniel F. Joella,* Assistant Counsel, with him *Joseph C. Bruno,* Chief Counsel, for Pennsylvania Public Utility Commission, appellee.

*Charles E. Thomas,* with him *Jack F. Aschinger, Thomas J. Munsch, Jr., Walter T. Wardzinski,* and *Metzger, Hafer, Keefer, Thomas & Wood,* for intervening appellee.

OPINION BY HOFFMAN, J., March 29, 1967:

This is an appeal by Allegheny Center Associates (Allegheny), owners and operators of a roofed-over mall "commercial center" from an order of the Pennsylvania Public Utility Commission. The issue, simply stated, is whether it was unreasonable for the Duquesne Light Company to refuse to supply single point electric service at wholesale rates to Allegheny for resale

or redistribution to prospective tenants.[1]  The pertinent facts follow:

Prior to June 1, 1965, Duquesne's Tariff Rule No. 18 provided:

"18.  RESALE.  Electric energy supplied to customers shall not be resold, except when supplied to customers operating office buildings *and buildings of similar character,* in which event it may be resold by the customer to tenants, provided such tenants occupy the premises designated in the contract between the customer and the Company, and the rates charged such tenants by the customer correspond to the rates charged by the Company for a like and contemporaneous service." (Emphasis supplied).

Under this Rule, owners of certain buildings were permitted to purchase single point electric service at wholesale rates.  This electricity would then be resold by the owners to their tenants at rates which would correspond to the regular rates charged to customers for similar service by Duquesne.

On March 31, 1965, Duquesne filed a tariff supplement with the Public Utility Commission revising Tariff Rule No. 18.  It was intended that this rule become effective June 1, 1965.  New Rule 18 provided:

"18.  REDISTRIBUTION.  All electric energy shall be consumed by the customer to whom the Company fur-

---

[1] Single point service refers to the delivery by the utility of electric service to the landlord at one service point. The electricity is then distributed by the landlord to his tenants.

Resale and redistribution are distinguished by the Commission in its order as follows: " '[R]esale' is the sale of electricity for a price by a utility customer to a third party who is the ultimate consumer, where the utility customer makes a charge for such electric service by submetering the electricity or makes a separate and distinct flat charge or charges. Redistribution is the supplying of electric service by a utility customer to a tenant of such customer who is the ultimate actual consumer without billing or making a separate and distinct charge for it other than as part of a rent package."

nishes such energy, except that (1) a customer operating a separate office building or separate apartment building, and (2) any other customer who, upon showing that special circumstances exist, obtains the written consent of the Company may redistribute electric energy to tenants of such customer, but only if such tenants are not required to make a specific payment for such energy. This rule shall not affect any practice undertaken prior to June 1, 1965."

The effect of proposed Rule 18 would be to make all submetering and resale of electricity invalid after June 1, 1965. The proposed rule, at the same time, would permit owners of certain buildings to redistribute electricity, but only when the tenants of those buildings were not required to make specific payments for such. Proposed Rule 18, however, would specifically preserve practices undertaken prior to June 1, 1965.

On May 24, 1965, two separate complaints were filed by Allegheny before the Pennsylvania Public Utility Commission. Complaint C. 18106 alleged that Allegheny was entitled to single point electric service at wholesale rates for resale or redistribution. Duquesne filed an answer admitting that it had refused to furnish such electric service but averring that such service was prohibited under old Rule 18.

Complaint C. 18107 alleged that proposed Rule 18 creates an unreasonable preference in favor of customers already receiving service under old Rule 18. Duquesne's answer to this Complaint denied that proposed Rule 18 would create an unreasonable preference.

On May 27, 1965, the Commission itself instituted an investigation into the reasonableness of proposed Rule 18, which investigation was docketed at C. 18109. Concurrently, the Commission suspended proposed Rule 18 until December 1, 1965. The rule was further suspended until March 1, 1966 by order of the Commission

dated November 22, 1965. On February 21, 1966, the new rule was stayed pending a final determination by the Commission in these proceedings.

The Commission, on May 16, 1966, held that Duquesne's refusal of single point service to Allegheny was not unreasonable, because the proposed commercial center "is not an office building or a building of similar character within the meaning and intendment of present Rule 18, nor a separate office building or separate apartment building within the meaning and intendment of proposed Rule 18." The Commission also found that neither old nor proposed Rule 18 were unreasonable or discriminatory.

On appeal, Allegheny contends that its commercial center is entitled to single point service at wholesale rates because it is an office building or building of similar character within the meaning of old Rule 18.[2] Allegheny argues, in the alternative, that it is entitled to such service even if it does not come within the exception of old Rule 18 because both old and new Rules 18 would be discriminatory as to it. In view of our decision in this case, as it subsequently appears in this opinion, we find it unnecessary to reach the second question raised.

---

[2] In this regard it should be noted that Allegheny's complaint was filed under old Rule 18, almost one full year before new Rule 18 became effective. Duquesne's refusal to provide the requested service was based upon its interpretation of old Rule 18. Duquesne does not contest Allegheny's statement that, "Duquesne's old Rule 18 was still in effect when Appellant applied for service and Appellant's application for service, therefore, is governed by this Rule." Duquesne agrees in its brief that, "In this case if this shopping center is an office building or building similar in character, then it is entitled to single point service under Duquesne's classification. . . ." Since Allegheny was involved in the planning, construction and leasing of its building, long before the effective date of proposed Rule 18, we agree that the proper determination of Allegheny's rights under old Rule 18 is appropriate.

. After carefully reviewing the evidence in this case, we conclude that the proposed commercial center is a building similar in character to an office building within the meaning of old Rule 18. In reversing the finding of the Commission on this point, we are mindful of the very great weight which must be accorded to the findings of the Public Utility Commission. *Clemmer v. Pennsylvania Public Utility Commission,* 207 Pa. Superior Ct. 388, 217 A. 2d 800 (1966). Nonetheless, we find in the instant case that the evidence, as a whole, was not legally sufficient to support the Commission's order.

Although we shall not recite all of the details with respect to the proposed center, the following facts are pertinent. The commercial center is a five level structure. The Pittsburgh Parking Authority owns the first three levels which will be leased to Northside Parking Corporation and used as a garage. The lowest two levels in this structure are underground. Part of the third level will be leased to Allegheny to house two stores. Allegheny will construct and own the fourth and fifth levels which will comprise a single building under one roof, having a common covered mall or court upon which all stores front.[3] The electrical distribution center, which is built into the building, can receive untransformed power at a single point and submeter it to Allegheny's tenants on the third, fourth and fifth levels.[4] The Commission found that Allegheny will be leasing most of its available space to commercial tenants, but that there would probably be some offices in the building.

---

[3] The fourth level will also have four separate free standing buildings.

[4] Sears, Roebuck & Co. has leased rights on the west end of the fourth level, will construct its own building thereon and will take its electricity directly from Duquesne.

The evidence adduced at the Commission's hearing clearly demonstrated that old Rule 18 has, in the past, been interpreted to apply to a wide variety of multi-tenanted, multi-purpose buildings under one roof. Thus, numerous examples were presented by Allegheny to demonstrate that single point service had been extended to many buildings in Pittsburgh which contained commercial tenants as well as offices.[5]

Allegheny attempted to distinguish these situations by suggesting that a building of similar character within the meaning of old Rule 18 is one which is used primarily for offices and which incidentally contains several commercial tenants.

The inaccuracy of this suggestion was most clearly pointed up, however, by the concession of Duquesne's own witnesses that apartment buildings and hotels are also considered buildings similar in character to office buildings.[6]

The testimony of Duquesne's own witnesses reflects, therefore, that there was no requirement that a build-

---

[5] The Jenkins Arcade building, for example, contains approximately 40 commercial tenants to whom electricity is submetered and resold.

[6] William F. Gilfillan, Duquesne's vice president in charge of sales, testified as follows:

"Q. Now, can you give the illustrations of what you have deemed to be buildings of similar character, in administering present Rule 18? As you recall, the rule states, customers operating office buildings and buildings of a similar character. I wonder if you could give me an illustration of what Duquesne Light Company had deemed to be buildings of similar character?

"A. Apartment buildings.

"Q. Apartment buildings?

"A. Yes, sir.

"Q. Have you permitted the resale of electricity by re-metering under the present Rule 18 in anything other than what you term office buildings and apartment buildings?

"A. The Penn-Sheraton Hotel, Carlton House Hotel, Roosevelt Hotel; I know of no other."

ing contain a preponderance of offices to qualify for single point service under old Rule 18. The only rational conclusion which does emerge from the testimony is that old Rule 18 applied to a wide variety of multi-tenanted, multi-purpose buildings under one roof. The proposed commercial structure clearly falls within that definition.[7]

We conclude, therefore, that the proposed commercial center is "an office building or a building of similar character" under old Rule 18 as that term has traditionally been interpreted by Duquesne. The Commission's finding that the center does not fall within that category is inconsistent with the established practice in Duquesne's service area as reflected in the testimony of Duquesne's own witnesses. Duquesne has for many years allowed single point service to a wide variety of multi-tenanted, multi-purpose buildings, including office buildings, office buildings with commercial tenants, apartment buildings and hotel buildings. To disallow service to this multi-purpose building, therefore, would constitute an unreasonable discrimination and should not be permitted. Public Utility Law, §402, 66 P.S. 1172.

Order reversed and record remanded to the Commission with directions to order intervening appellee to grant appellant single point service for resale or redistribution.

---

[7] Other criteria suggested by Duquesne's witness were similarly demonstrated to be without merit. Thus, one expert witness for Duquesne first stated that unlike offices, shopping center tenants generally have longer leases or percentage leases. He later conceded, however, that there was much variation in the length and nature of leases in both office buildings and shopping centers, citing specific examples of leases in office buildings which were long term or on a percentage basis.

DISSENTING OPINION BY WRIGHT, J.:

The issues which these appeals concern are primarily administrative in character and peculiarly within the province of the Commission to determine. The problems involved were thoroughly and intelligently analyzed by the Commission. Its findings, having substantial basis in the voluminous record, are reasonable and in conformity with the law. I would affirm the Commission's order.