Bucks County Board of Commissioners, Bucks County Planning Commission, Montgomery County Board of Commissioners, Montgomery County Planning Commission, Richardson Dillworth and Andrew L. Lewis, Jr., Trustees of the Property of Reading Co., Debtor, Stops, Bi-County Environmental Committee and Mary Bean Rogers, Appellant, *v.* Commonwealth of Pennsylvania, Pennsylvania Public Utility Commission, Appellee, and Interstate Energy Company and Pennsylvania Power Light Company, Intervening Appellee. Commonwealth of Pennsylvania, Department of Transportation, Appellant, *v.* Commonwealth of Pennsylvania, Pennsylvania Public Utility Commission, Appellee, and Interstate Energy Company, Intervening Appellee.

Argued September 10, 1973, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Lionel B. Gumnit*, Assistant Attorney General, for appellant, Department of Transportation.

*Darold L. Hemphill,* with him *Butterfield, Joachim, Broot, Hemphill & Houser,* for remaining appellants.

*Philip P. Kalodner,* Counsel, with him *Philip R. Mann,* Assistant Counsel, for appellee.

*Peter Platten,* with him, of counsel, *Ballard, Spahr, Andrews & Ingersoll,* for intervening appellee, Interstate Energy Company.

*Murray Milkman,* with him *Gennaro D. Caliendo,* for intervening appellee, Pennsylvania Power & Light Company.

OPINION BY JUDGE ROGERS, December 12, 1973:

There are before us two appeals from orders of the Public Utility Commission (PUC). The first is the appeal of the Bucks County Board of Commissioners and its Planning Commission; the Montgomery County Board of Commissioners and its Planning Commission; the Trustees of the Reading Railroad; an ad hoc committee using the acronym STOPS[1]; a regional environmental committee; and of one individual, from an order granting a Certificate of Public Convenience to Interstate Energy Company (IEC) to supply service by pipeline in the transportation of petroleum products, principally low sulfur residual and crude oil, for the purpose of electric generation. The second appeal is that of the Pennsylvania Department of Transportation from an order denying its petition for rehearing of IEC's application after the PUC's order came down.

Pennsylvania Power and Light Company (PP&L) is an electric public utility company which supplies electric power to more than 843,000 customers in 10,000 square miles of territory in the area of Pennsylvania drained by the Delaware and Susquehanna Rivers.

---

[1] Standing for Stop The Oil Pipeline Society.

Most of its generating capacity is located in the Susquehanna basin in the central and western part of its system. PP&L's total sales of electrical energy were 14.7 billion kilowatt hours in 1970. It estimates that sales in 1975 will be 20.3 billion kilowatt hours, and in 1980, 29.5 billion kilowatt hours. Its present winter peak load is 3.2 million kilowatts. This is estimated to increase to 4.4 million kilowatts by 1975, and to 6.4 million kilowatts by 1980. These predictions convinced PP&L that its installed capacity should be doubled by 1980. The company's planning to meet this demand included the planned installation in 1975 and 1977 of two 800,000 kilowatt generating units at its present Martins Creek terminal near the Delaware River in Northampton County. The company further planned that its new units at Martins Creek should be oil-fired and that the two existing 151,000 kilowatt coal burning units there located should be converted to oil. The company's decision to burn oil was based primarily upon considerations of the reduction of air pollution, the excessive cost of other means of fueling its generators and the desirability of diversifying its fuel sources. Conventional hydroelectric generating capacity of the available rivers are fully developed; nuclear facilities could not be completed in time to meet the demand; and pump storage was ruled out because base load capacity is required and pump storage is dependent on power produced by other generating capacity.

PP&L would have preferred to have constructed a coal fired plant in the western part of its system. This, however, would have required the construction of 80 miles of transmission lines in new rights-of-way at a cost of 20 million dollars. The company rejected such a plan for, among other reasons, esthetic and environmental reasons.[2]

---

[2] *See Clemmer et al. v. Pennsylvania Public Utility Commission*, 207 Pa. Superior Ct. 388, 217 A. 2d 800 (1966), a case in which

PP&L's studies indicated that a coal-fired plant in the eastern part of its area would increase fuel delivery costs by about 10 million dollars per year. They also revealed that a workable commercial system to reduce sulfur dioxide emissions from the type of coal available in the eastern part of the United States would not be available until after 1975. On the other hand, low sulfur fuel oil was available and would have the additional desirable effect of increasing the amount of the company's capacity provided by oil, presently about 10% of the company's capacity.

Having thus determined on oil and on the Martins Creek location[3] the remaining question was how to bring the oil from the lower Delaware to Martins Creek. The company considered tank trucks, rail and pipeline. The two 800,000 kilowatt units and the converted existing units would consume approximately 20 million barrels of oil per year. To provide these requirements by truck would require the arrival at Martins Creek of forty-four 7000 gallon trucks per hour during an eight hour day, 360 days a year. None of the appellants suggests that this would be an acceptable means of supplying Martins Creek with oil. The delivery of oil by rail would require the daily arrival at Martins Creek of a train of 110 cars. Because of a necessary two day turnaround two such 110 car trains would be required. PP&L would be required to supply not only the trains but the loading and unloading facilities at both ends. The company concluded that while the total shipping cost per barrel by rail would be about the same as by

many of the same arguments advanced by the appellants here against the pipeline were made unsuccessfully in opposition to an overhead transmission line, in proceedings identical in form and comparable in scope and bulk, to the instant action.

[3] Although a generating facility might have been located closer to a convenient point of oil supply on the lower Delaware, this would have required additional overhead transmission lines to the company's service area.

pipeline, the additional considerations of prospective increased labor costs of railroad operations, the danger of strikes and the additional labor which would be required for housekeeping at both ends of the lines, compelled the decision to use pipeline delivery.

Having completed its studies and decided to use oil transported by pipeline, PP&L solicited from enterprises experienced in the business invitations to supply Martins Creek by an oil pipeline. One of the bidders was Gulf Interstate Engineering Company, which proposed the formation of a common carrier pipeline company to construct and operate the proposed pipeline. PP&L accepted this proposal, IEC was formed and IEC made the application which is the subject of this appeal.

IEC proposes an intrastate pipeline facility 80 miles long between Marcus Hook in Lower Chichester Township, Delaware County, on the south, and Martins Creek on the north, with an extension of nine miles to serve Metropolitan Edison at Portland, north of Martins Creek, a lateral 6.8 miles long to serve New Jersey Power and Light on the east bank of the Delaware River south of Martins Creek, and a takeoff point to serve Philadelphia Electric Company at the latter's Cromby terminal near the Chester-Montgomery County boundary line.

PUC preliminary to hearings, defined its inquiry into the project by four questions, upon which it solicited information, as follows:

"A. Is the furnishing of low sulfur fuel to the Martins Creek area necessary for the public convenience?

"B. Is the transmission of low sulfur content residual oil by pipeline the best means, from the public viewpoint, to deliver the required fuel to the area?

"C. Has the carrier exercised great concern for the public interest and safety in transmission pipeline route selection?

"D. Are adequate provisions made for review and supervision of design and construction?"

Eighteen days of hearing produced almost 3000 pages of testimony all of which, together with appellants' 117 page brief, and the Commission's 47 page order, we have reviewed. Our inquiry is as to whether the Commission's order granting the Certificate of Public Convenience should be vacated or set aside for error of law or lack of supporting evidence or for violation of constitutional rights. Public Utility Law, Act of May 28, 1937, P. L. 1053, §1107, as amended, 66 P.S. §1437. The scope of our review is narrow. As we wrote in *Erie Lackawanna Railway Company v. Pa. Public Utility Commission*, 2 Pa. Commonwealth Ct. 396, 399, 278 A. 2d 188 (1971) : "The Public Utility Law, infra, Article XI, Section 1107, as amended, 66 P.S. 1437, provides that we may not 'vacate or set aside the Commission's order, either in whole, or in part, except for error of law or lack of evidence to support the finding, determination, or order of the Commission, or violation of constitutional rights.' We may not exercise our independent judgment on the record. Clemmer v. Pennsylvania Public Utility Commission, 207 Pa. Super. 388, 217 A. 2d 800 (1966). If there is substantial evidence in support of the order of the Commission, we may not set it aside. Modern Transfer Company v. Pennsylvania Public Utility Commission, 182 Pa. Super. 110, 125 A. 2d 463 (1956). Substantial evidence is such relevant evidence as a reasonable mind can accept as adequate to support a conclusion. Pittsburgh Railways Company v. Pennsylvania Public Utility Commission, 198 Pa. Super. 415, 182 A. 2d 80 (1962)." and in *Johnstown-Pittsburgh Express, Inc. v. Public Utility Commission and W. C. McQuaide, Inc.*, 5 Pa. Commonwealth Ct. 521, 525, 291 A. 2d 545 (1972) :

"As Judge Wilkinson wrote in Tranter v. Pennsylvania Public Utility Commission, 4 Pa. Commonwealth

Ct. 585, 588, 288 A. 2d 837, 839 (1972) : 'Our scope of review is delineated by the Public Utility Law, Act of May 28, 1937, P. L. 1053, as amended, 66 P.S. §1101, et seq., which provides in Section 1106, 66 P.S. §1437, and Section 1112, 66 P.S. §1442, that the order of the Commission shall not be vacated or set aside on appeal except for error of law or lack of evidence to support it, and that the order shall be prima facie evidence of the facts found.' The provision of the Public Utility Law cited by Judge WILKINSON has been held to mean that we may not conceive an independent judgment and substitute it for the judgment of the Commission and that we may not indulge in processes of weighing evidence and resolving conflicting testimony. McNaughton Bros., Inc. v. P.U.C., 2 Pa. Commonwealth Ct. 319, 278 A. 2d 186 (1971) ; Highway Express Lines, Inc. v. Pa. P.U.C., 195 Pa. Superior Ct. 92, 169 A. 2d 798 (1961) ; Clemmer v. Pa. P.U.C., 207 Pa. Superior Ct. 388, 217 A. 2d 800 (1966) ; Peoples Cab Co. v. P.U.C., 216 Pa. Superior Ct. 18, 260 A. 2d 490 (1969). Rather, as stated by Justice ROBERTS in Philadelphia Suburban Water Co. v. Pa. P.U.C., 425 Pa. 501, 508, 512, 299 A. 2d 748, 752, 754 (1967) :

" 'As regards . . . the public interest . . . the commission's discretion must be accepted unless totally without support in the record, based on an error of law or unconstitutional.

. . . .

" 'Neither this Court nor the Superior Court . . . was intended by the Legislature to weigh the various factors entering in the granting of a certificate of public convenience and necessity by the Commission. . . .' "

There is no evidence in the record rebutting PP&L's need for increased capacity or the desirability for such capacity to be in the eastern portion of its service area. Nor is there evidence that there is a better place than

Martins Creek for new generating facilities in PP&L's service area.

The public's need for additional electrical energy in the area and the appropriateness of Martins Creek as a location for the new generating facilities being clear, the appellants nevertheless contended that alternatives which would obviate the construction of a pipeline and which would be better in the public interest existed. These were the transport of oil by rail and, despite the allegiance of some of the appellants to the cause of a clean environment, the burning of coal transported by rail. The transport of oil by rail presents a number of difficulties, not the least of which is that not only are the facilities for accomplishing this not presently available, the financially unsound railroads would require the shippers to provide as the Commission found, "220 specially constructed insulated tank cars, plus necessary additional cars taken out of service for maintenance; to provide a switch yard, personnel and motive power to make up 1¼ mile long trains on not more than two tracks, at each end of the run; to design, construct, maintain and operate, at each end of the run loading facilities to handle three kinds of fuel." The Commission compared the cost of these facilities with that of the pipeline and docking facilities necessary under IEC's application and considered the comparative emission of pollutants by railroad locomotives and oil pumps. It concluded that rail transportation would cost more, burn more fuel and develop more air pollution than transportation by pipeline. We find ample evidence to support each of these conclusions.

As for proposal that coal be used, the record establishes that the use of low sulfur oil will not offend any existing air pollution standards whereas there still exists a substantial question as to the reliability of flue gas sulfur removal systems on large power plants. This information was elicited from the Director of the

Bureau of Air Quality and Noise Control of the Pennsylvania Department of Environmental Resources.

The appellants further contended that this application should be refused because of the injury the pipeline will cause to other environmental interests, chiefly to places and things of historical interest and to the natural environment. The Commission conceded that these interests would be affected by the laying of a pipeline but concluded that these effects could be reduced by careful and vigilant construction work and careful line selection. The Commission's order requires IEC to submit a list of historical or archeological sites within 1000 feet of the line, requires it to place the pipeline no closer to the boundary line of such a site than 25 feet, orders it to permit exploration of alleged archeological sites before construction of the line, and directs it to cooperate with a local historical society in the location of the line in identified historical locations.

Although the appellants' brief does not emphasize the matter of the selection of the route for the pipeline, IEC's personnel responsible for alignment were extensively examined and cross-examined. The appellants' efforts were with the purpose of establishing a failure on the part of the applicant to avoid unnecessary injury or its neglect of opportunities to use or follow existing utility rights-of-way. This record established and the Commission properly found that great concern had been exercised for the public interest in the matter of route selection. Of the total distance to be traversed by the main pipeline, plus laterals, of 95.8 miles, 58 percent or 55 miles are proposed to be placed in or alongside existing utility rights-of-way. Not only is the Commission's finding of proper concern already exercised supported by the record, its order requires, as we have noted, further report to the Commission concerning some historical sites and cooperation with munici-

palities in the avoidance, where possible, of disturbance to municipal planning.

In sum, our review reveals that the Commission's findings particular and conclusory have substantial support in this record and that its order granting the Certificate as in the public interest rests upon a firm foundation of facts.

The appellants contend, as we understand their brief and argument, that the Commission committed three errors of law. They first declare that IEC is not a public utility because it is a creation of one or a few privately owned public utilities designed to serve only them. It is to be noted in this regard that the oil passing through the line will belong to the shippers, not IEC, and that the application seeks and the Certificate confers the right to transport petroleum products limited in use to the supply of oil for electric generation. The record establishes that IEC will establish rates, file tariffs, that it will transport oil for all shippers, and, if necessary, that it will prorate capacity among shippers. It is, under the law, a public utility although, of necessity, it will have few customers. The appellants simply disagree with the holding of *Independence Township School District Appeal*, 412 Pa. 302, 194 A. 2d 437 (1963) that a pipeline company serving three non-public utilities was nevertheless a public utility entitled to exemption from local taxes.

The appellants further contend that the Commission erred in law in failing to evaluate IEC's application under Article I, Section 27, of the Pennsylvania Constitution, and in failing to apply that constitutional provision to IEC's application. The provision in question declares that the people have the right to clean air, pure water and the preservation of the natural, scenic, historic and esthetic values of the environment and requires the Commonwealth as trustee to conserve and maintain the State's natural resources. We have held

that this provision is self-executing. *Commonwealth v. National Gettysburg Battlefield Tower, Inc.*, 8 Pa. Commonwealth Ct. 231, 302 A. 2d 886 (1973), aff'd 454 Pa. 193, 311 A. 2d 588 (No. 365 January Term, 1973, filed October 3, 1973). The appellants' argument founded on that holding is that if it were shown that the pipeline will have any effect on the interests enumerated in Article I, Section 27, it was the Commission's constitutional duty to proscribe it. We were presented the same argument in *Payne et al. v. Kassab et al.,* 11 Pa. Commonwealth Ct. 14, 312 A. 2d 86 (No. 1061 C.D. 1971, filed November 21, 1973), which Judge MENCER answered as follows:

"This Court's awareness of the ramifications of such an absolute interpretation caused us to point out in *Gettysburg* that '[I]t is difficult to conceive of any human activity that does not in some degree impair the natural, scenic and esthetic values of any environment. If the standard of injury to historic values is to be that expressed by the Commonwealth's witnesses as an "intrusion" or "distraction," it becomes difficult to imagine any activity in the vicinity of Gettysburg which would not unconstitutionally harm its historic values.' *Id.* at 249, 302 A. 2d at 895.

"Likewise, it becomes difficult to imagine any activity in the vicinity of River Street that would not offend the interpretation of Article I, Section 27 which plaintiffs urge upon us. We hold that Section 27 was intended to allow the normal development of property in the Commonwealth, while at the same time constitutionally affixing a public trust concept to the management of public natural resources of Pennsylvania. The result of our holding is a controlled development of resources rather than no development.

"We must recognize, as a corollary of such a conclusion, that decision makers will be faced with the constant and difficult task of weighing conflicting en-

vironmental and social concerns in arriving at a course of action that will be expedient as well as reflective of the high priority which constitutionally has been placed on the conservation of our natural, scenic, esthetic and historical resources.

"Judicial review of the endless decisions that will result from such a balancing of environmental and social concerns must be realistic and not merely legalistic. The court's role must be to test the decision under review by a threefold standard: (1) was there compliance with all applicable statutes and regulations relevant to the protection of the Commonwealth's public natural resources? (2) Does the record demonstrate a reasonable effort to reduce the environmental incursion to a minimum? (3) Does the environmental harm which will result from the challenged decision or action so clearly outweigh the benefits to be derived therefrom that to proceed further would be an abuse of discretion?" The Commission here, although without the benefit of our opinion in *Payne,* in fact applied the standards of that case. It carefully considered the effects of the pipeline on the several values protected by Article I, Section 27 and balanced them against the necessity for increased energy. After assuring itself that IEC's proposal was carefully planned and the most acceptable means of providing fuel to the generators at Martins Creek, it concluded that the need for energy outweighed the indicated injury to the environment. Our consideration of the record compels agreement with that conclusion.

Finally, the appellants argue that the Commission erred in not granting the Pennsylvania Department of Transportation's petition for rehearing pursuant to Section 1006 of the Code, 66 P.S. §1396. The hearings in this matter were conducted in the period from March through August of 1972. The Commission's order was made on February 6, 1973. The application for rehear-

ing made in March 1973 cited as a reason for further hearings a threatened short supply of low sulfur fuel oil and offered proof of a developing scarcity of and prohibitive prices for this product. The testimony of applicants' witnesses at the Commission hearings was that the shippers had commitments for this fuel. We are required to decide this matter as of the time the Commission had the application for rehearing before it. The petition is most general and fails to describe what evidence was available in March 1973 but not available before that time. The subject matter sought to be re-examined had generally been touched upon at the hearings before the Commission and it was no abuse of the Commission's discretion to refuse to hear more as of March 1973. Further, even if the petitioner offered additional and newly discovered evidence of a scarcity of oil generally and if such had been proved, it would be no abuse of the Commission's discretion to grant a Certificate to a pipeline carrier whose shippers, despite a general scarcity, in fact had oil to be transported. *See City of Arnold v. Pennsylvania Public Utility Commission*, 192 Pa. Superior Ct. 476, 162 A. 2d 77 (1960) ; *Byers v. Pennsylvania Public Utility Commission*, 176 Pa. Superior Ct. 620, 109 A. 2d 232 (1955). As for the present state of affairs, apparently worsened by reason of war in the Middle East, we will assume that IEC will proceed with the construction of a pipeline without shippers with products to transport or that, even if this were the case, that the Commission would not exercise its broad powers over its orders conferred by statute. Public Utility Code, §1007, 66 P.S. §1397.

Order affirmed.