## Miller's Appeal

*Jay V. Yost*, for appellant.
*Eugene E. Dice*, for Commonwealth.

BROUGHTON, Chairman, Issued August 27, 1974. —This case is an appeal by Paul K. Miller (hereinafter "Miller"), owner and operator of Paul K. Miller Mobile Home Park (hereinafter "park"), from the denial, by the Department of Environmental Resources (hereinafter "department") of a permit to construct a sewage treatment plant in connection with the enlarging of the park. The park now consists of 19 units, serviced by a subsurface disposal system. Miller desires to expand to 85 units, and build a sewage treatment plant capable of meeting the standards of the Clean Streams Law of June 22, 1937, P. L. 1987,

as amended, 35 PS §691.1, et seq. The proposed plant would discharge to a tributary of Deer Creek.

Following a public hearing, a "fact finding" hearing following a legislative hearing format in York, Pa., on March 2, 1972, relating to this and two other permit applications, the department denied Miller's permit application, by letter dated November 13, 1972.

The other two permit applications referred to, by Heritage Farms, Inc., and Reybold Corporation, also for permits to operate sewage treatment plants to service trailer parks, were granted. Those two were appealed by citizens resident in the area and downstream from the proposed facilities, at E.H.B. Docket No. 73-414-B. Initially, all three cases were consolidated but, upon considering the fact that the issues and the ultimate burden of proof in the Miller case (where the permit was denied) were reversed relative to the other two (where the permits were granted), and also the fact that it appeared that the Miller case could be decided on briefs and a stipulation of the relatively few factual questions, this case was severed from the other two.

The Miller case, above captioned, was then submitted, not on the basis of a formal stipulation but on the basis of briefs each containing a statement of facts largely in agreement. With regard to one set of facts contained in Miller's brief, pertaining to economic issues, the department does not admit the relevancy of those facts, but admits their truthfulness and accuracy.

The department also moved that the evidence submitted in the other two cases be considered in this one. Because those cases are now continued pending apparently probable withdrawal or settlement and, because of the burden of proof problem, that motion is denied. The only item that has been introduced

into the record in those two cases that is considered in any way here is the set of United States Geologic Survey 7.5 minute topographic maps of the entire area.

Based on the briefs and documents submitted therewith, we make the following:

## FINDINGS OF FACT

1. Miller is the owner of a 15-acre wooded tract situate in Hopewell Township, York County, Pa.; fronting on PennDOT Highway No. 66123. Hopewell Township is a second class township. This tract is presently improved as a mobile home park accommodating 19 units. The tract is in an agricultural zone under the Hopewell Township zoning ordinance. Miller is operating a subsurface waste treatment facility to accommodate the 19 mobile home units in accordance with a permit previously issued. Miller desires to further develop his tract to accommodate a total of 85 units and has obtained zoning approval from the township authorities. His proposed expansion is in accordance with a plan prepared by William E. Sacra and Associates, Consulting Engineers, dated June 1971.

2. The proposed mobile home park is located in Hopewell Township, York County, approximately two and one-half miles east of Shrewsbury and about three miles northwest from Stewartstown.

3. Miller submitted his application dated December 14, 1971, to the department requesting a sewage permit for the construction of a waste water treatment sewage facility. The effluent of the proposed facility was to flow into a tributary of Deer Creek at a point which has been investigated by department personnel by an on-site inspection, which investigation deter-

mined that the creek was adequate to accept the effluent. Submitted with the application was a plan and profile of a waste water treatment facility, dated November 16, 1971, prepared by William E. Sacra and Associates. The plan calls for the construction of a sewage facility which meets the technical standards of the Clean Streams Law, supra, and the Pennsylvania Sewage Facilities Act of January 24, 1966, P. L. (1965) 1535, as amended, 35 PS §750.1, et seq.

4. The proposed effluent from the treatment facility, as described in the application, would not cause the stream standards established by department regulations for the receiving stream to be exceeded.

5. Deer Creek is a cold water stream having a better quality than the applicable water quality criteria and the discharge into said watershed of Miller's proposed sewage effluent would have the effect of degrading the said water, though not to the point where it would violate the applicable water quality criteria.

6. On March 2, 1972, the department held a public fact-finding hearing in York, Pa., notice of which was published in the local newspapers prior to the said date. The purpose of the hearing was to gather facts and information to aid the department in its decision on Miller's permit application, as well as on applications submitted by two other applicants for similar treatment plans in the same general area as Appellants.

7. By letter of Elvin F. Hoover, P. E., Regional Sanitary Engineer, dated November 13, 1972, Miller was informed that his permit application was denied. The reason stated in the notice of denial are as follows:

"The reason for denial is that a permit for sewage treatment facilities to serve your mobile home park will not be consistent with good wastewater manage-

ment planning as required by the Rules and Regulations of the Department, Chapter 91, Sections 31 and 32 and Sections 4 and 5 of the Clean Streams Law. The mobile home park will be located approximately one mile from the Deer Creek pump station of the Shrewsbury Borough system to be constructed in the near future. The park will be located in a potential rapid growth area of Hopewell Township. It appears likely that extension of a sewer from the pumping station to the area to serve the mobile home park and other present and future uses would be feasible. It is necessary that the project conform to the sewerage plan of Hopewell Township."

8. Miller's proposed sewage treatment facility is located in a position whereby a connection to the Shrewsbury municipal sewerage system could be obtained by installation of approximately 6,000 lineal feet of eight-inch pipe. No pump stations would be required.

9. The Shrewsbury municipal sewerage system has adequate capacity to accept and treat Miller's proposed discharge.

10. On June 5, 1972, James V. Donato prepared a document entitled "Summary of Proposed Sewage Treatment Projects on the Deer Creek Watershed," which was submitted to Elvin F. Hoover, then Regional Sanitary Engineer, and Daniel B. Drawbaugh, Chief, Division of Water Supply and Sewerage. This document was used by the department as an aid in making its decision on Miller's application, as well as two other applications for similar systems in the same geographic area.

11. On September 13, 1972, Daniel B. Drawbaugh sent a memorandum relating to all three permit applications to Dr. Maurice K. Goddard, secretary of the department, recommending, among other things,

that the Paul K. Miller application be denied. The relevant paragraph of that memorandum read as follows:

"Paul K. Miller Mobile Home Park—Existing park utilizing on-lot disposal facilities with capacity for up to 19 units. Request is to expand to 85 units. Park is located approximately one mile from the Deer Creek pump station of the Shrewsbury Borough system to be constructed in the near future. Park is located in a potential rapid growth area of Hopewell Township. It appears likely that extension of a sewer from the pumping station to this area to serve the mobile home park and other present and future users would be feasible. Recommendation: That the permit for sewage treatment facilities to serve 85 units be denied on the basis that such facilities would be inconsistent with good wastewater management planning."

12. On October 11, 1972, Hopewell Township adopted as its official plan, under the Sewage Facilities Act, supra, the York County Planning Commission's Comprehensive Plan, dated May, 1972.

13. The York County Comprehensive Plan does not provide for a private sewage treatment facility at the site of the proposed Paul K. Miller facility.

14. On November 13, 1972, the department issued sewerage permits to Reybold Corporation and Heritage Farms, Inc. for the construction and operation of private sewage treatment facilities with discharge to the Deer Creek Watershed.

15. The proposed Reybold and Heritage Farms treatment facilities are further from available or proposed public sewage treatment collection facilities than is the Paul K. Miller facility, and the cost of connection thereto would be significantly greater for

Reybold and Heritage than similar costs for Paul K. Miller.

16. The proposed Reybold and Heritage Farms treatment facilities would require pump stations and forced pumping in order to connect to available or proposed public sewage treatment collection facilities, while the Miller facility could rely on gravity flow to connect to the Shrewsbury system. A gravity flow line is significantly less expensive to construct and operate than is a force main, requiring pumping.

17. The Heritage Farms and Reybold discharges would discharge downstream from an area which has been identified to the department as a proposed public drinking water supply, while the Miller discharge would be immediately upstream from the said area.

18. A comparison of costs between Miller's connecting to the closest municipal sewage plant and constructing the private facility in accordance with his request for a permit was submitted by Miller's engineer as an exhibit attached to his application. This comparison has since been revised primarily due to increasing construction costs and the now-known rates for treatment of the municipal system, and is as follows:

   I. *Private Treatment System:*

      a.  12,000 gallon extended aeration package plant with sand filters and all appurtenances  . . . . . . . . . . . . . . . . . . . . $ 42,000

      b.  *Yearly Cost* (Operation) = $4,500 = $53/yr/unit of Capital expenditures for 20-year financing  . . . . . . . . . . . 7,000

  II. *Interceptor to Shrewsbury Collection System:*

      a.  6,000 lineal ft. min 8″ pipe installed at $14.00/ft.  . . . . . . . . . . . . . . . . . . . . 84,000

20 Manholes at $500 each ........... 10,000
Engineering and Right-of-Way .... 14,000

108,000

b.

*Yearly Costs:*

85 units x $140/unit treatment at New
Freedom Plant ................. $ 11,900
85 units x $20/unit transportation in
Shrewsbury interceptor ......... 1,700

Total Yearly Cost = $160/yr/unit ... $ 13,600

c. Capital expenditures for 20-year
financing ..................... $ 15,500

19. The following is an outline of applicant's present
capital investment in his property:

Manager's home ................... $ 10,000
Garage and Workshop ............. 7,000
Laundry Building ................. 5,000
Streets ......................... 15,000
Concrete Pads for Mobile Homes ..... 60,000
Present subsurface Sewage System
excluding labor ................. 4,500
Water Supply System .............. 3,000
Street Lighting .................. 3,000
Gas Distribution System ........... 4,500
Maintenance Equipment:
  Backhoe
  Snow removal equipment
  2 Dump Trucks
  Pickup Truck ................. 10,000
3 Mobile Homes .................. 9,500

$138,300

Much of Miller's own labor is not included in the
above costs. Miller commenced improving his tract
in May of 1968. He works regularly for Black and

Decker from 3 in the afternoon until 11 at night. Each week-day he has been devoting seven hours of labor to improving his tract as well as each weekend. It is estimated that the worth of his labor exceeds $20,000. The total capital investment existing at present is conservatively estimated at $165,000.

20. Miller's Mobile Home Park is located in a potential rapid growth area of Hopewell Township and the installation of an interceptor to the Shrewsbury system would enhance rational development of the said area.

## DISCUSSION

The Department denied Miller's application, not because it would violate the Clean Streams Law, supra, or the Sewage Facilities Act, supra, but because, under section 91.32 of the regulations, the department is required to look with disfavor upon private sewage treatment plants, and is required to consider, where feasible, consolidated, regional or municipal sewage treatment plants.[1] In addition, this plant was not provided for by the Sewage Facilities Act Plan adopted by Hopewell Township, and that plan would have had to be amended, before a permit could have been issued

---

[1] "§91.32 Private projects.

"(a) The Department shall look with disfavor upon applications for sewerage permits for private sewerage projects to be located within the built-up parts of cities, boroughs, and first and second class townships.

"(b) In general, issuance of such sewerage permits shall be limited to proper private sewerage projects located in the rural parts of first and second class townships, and for which areas there appears to be no present necessity for public sewerage."

by the department under section 91.31 of the regulations.[2]

We disagree with the department's contention that the cost and capital investment data submitted by Miller with his application, and in his brief, are irrelevant. The very heart of the decision as to whether it is feasible in a particular case to connect to a potentially "available" municipal sewage treatment plant depends on such financial data. The department's decision, for example, would probably have been very different if what were involved here had been two or three houses, or two or three mobile home units, than where what was involved was an increase of 66 mobile home units. Indeed, the department's decision in the other two cases in the Deer Creek watershed, Heritage Farms, Inc., and Reybold Corporation, was different and the difference was based on just the sort of financial data that the department is here claiming is irrelevant.

---

[2] "§91.31. Comprehensive water quality management.

"(a) The Department shall not approve a project requiring such approval under the act or the provisions of this Article unless the project is included in and conforms with a comprehensive program of water quality management and pollution control, PROVIDED, HOWEVER, that the Department may approve a project which is not included in a comprehensive program of water quality management and pollution control if the Department finds that such a project is necessary and appropriate to abate existing pollution or health hazards and that said project will not preclude the development and/or implementation of the comprehensive program.

"(b) The basis for determining whether a project is included in and conforms to a comprehensive program of water quality management and pollution control shall be:

"(1) Appropriate Comprehensive Water Quality Management Plans approved by the Department; and

"(2) Official Plans for Sewage Systems which are required by Chapter 71 of this title."

We are mindful also of the policy statements and requirements of sections 4 and 5 of the Clean Streams Law, supra, 35 PS §§691.4 and 691.5, which provide as follows:

"§691.4 Declaration of policy

"(1) Clean, unpolluted streams are absolutely essential if Pennsylvania is to attract new manufacturing industries and to develop Pennsylvania's full share of the tourist industry;

"(2) Clean, unpolluted water is absolutely essential if Pennsylvanians are to have adequate out of door recreational facilities in the decades ahead;

"(3) It is the objective of the Clean Streams Law not only to prevent further pollution of the waters of the Commonwealth, but also to reclaim and restore to a clean, unpolluted condition every stream in Pennsylvania that is presently polluted;

"(4) The prevention and elimination of water pollution is recognized as being directly related to the economic future of the Commonwealth; and

"(5) The achievement of the objective herein set forth requires a comprehensive program of watershed management and control."

"§691.5 Powers and duties

"(a) The board and the department, in adopting rules and regulations, in establishing policy and priorities, in issuing orders or permits, and in taking any other action pursuant to this act, shall, in the exercise of sound judgment and discretion, and for the purpose of implementing the declaration of policy set forth in section 4 of this act, consider, where applicable, the following:

"(1) Water quality management and pollution control in the watershed as a whole;

"(2) The present and possible future uses of particular waters;

"(3) The feasibility of combined or joint treatment facilities;

"(4) The state of scientific and technological knowledge;

"(5) *The immediate and long-range economic impact upon the Commonwealth and its citizens.*

"(b) The board shall have the power and its duty shall be to:

"(1) Formulate, adopt, promulgate and repeal such rules and regulations and issue such orders as are necessary to implement the provisions of this act.

"(2) Establish policies for effective water quality control and water quality management in the Commonwealth of Pennsylvania and coordinate and be responsible for the development and implementation of comprehensive public water supply, waste management and other water quality plans." (Emphasis added.)

While holding that the economic data submitted by Miller is relevant, however, we cannot say that the decision of the department is unreasonable. Given the policy of the Clean Streams Law, supra, and the Sewage Facilities Act, supra, and of the regulations promulgated thereunder, all in favor of sewage treatment on a coordinated basis for watersheds as a whole, we think that the requirement that Miller connect to the Sewage Treatment Plant instead of constructing his own private plant is, while costly to Miller, not so costly as to be unreasonable.

We will not uphold the denial, however, but will remand to the department. Sections 4 and 5 of the Clean Streams Law, quoted supra, and Article I, sec. 27 of the Constitution of Pennsylvania both require that broader environmental and other implications of an action be considered than appear to have been considered here: Fox v. Commonwealth, E.H.B. Docket No. 73-078 (issued June 12, 1974); Payne v.

Kassab, 11 Pa. Commonwealth Ct. 14, 312 A.2d 86 (1973); Bucks County Board of Commissioners v. Pennsylvania Public Utility Commission, 11 Pa. Commonwealth Ct. 487, 313 A.2d 185 (1973). Here, from the documents submitted (especially the transcript of the March 2, 1972, public hearing, and the memoranda referred to in findings of fact nos. 10 and 11), the main environmental consideration seems to have been water pollution treatment and prevention, or, as put in the memo from Daniel B. Drawbaugh to Secretary Maurice K. Goddard, "good wastewater management planning." We do not want to be misunderstood as saying that good waterwaste management planning is unimportant. It is, but other problems must also be considered.

Here, there are three problems that seem not to have been considered. First, about a mile of the 6,000 feet of sewer line that would have to be built by Miller to connect to the Shrewsbury Sewage Treatment Plant would be built down a relatively developed stream valley. What is the impact of such a sewer line location and placement on that stream valley? Second, and related, it appears to have been assumed that the sewer line to be built to service Miller's Mobile Home Park would also serve other development in the vicinity of that Park. But it would not necessarily have the capacity to do so if Miller built it to serve only his facility, and there is no particular reason why Miller should build a larger sewer line, at least no reason that appears on the record.[3] If, given the department's decision, Miller constructed a line to service his mobile home park, a later public sewer line might be required to serve other development in the area. This would

---

[3] We must assume that this permit denial is not being used as a means of forcing development of public sewerage services in the area. If it is, that is improper: Trautner v. Commonwealth, E.H.B. Docket No. 73-359-W, (issued August 1, 1974).

require that the stream valley, or bed, in question be dug up a second time for the emplacement of this public line.

Third, if the Miller interceptor were built with enough capacity to serve the area, it would, as suggested by the department and as we have found, enhance development. How much would a sewer line with some given capacity enhance development, and how much of such enhancement is desirable? What consideration, if any, has been given these issues by the relevant municipal and/or regional comprehensive plans?

It seems to us that section 5 of the Clean Streams Law, supra, and Article I, sec. 27, of the Constitution, read together, require the department to consider these impacts before making a decision that requires action that results in these impacts: Fox v. Commonwealth, supra; Payne v. Kassab, supra; Bucks County Commissioners v. Pennsylvania Public Utility Commission, supra. We cannot find that the department did consider these impacts. We, therefore, remand to the department to explicitly consider these impacts. As in Fox, supra, we emphasize that we take no position on what the end result of that remand should be.

## CONCLUSIONS OF LAW

1. This board has jurisdiction over this case and over the parties before it.

2. In considering an application for a sewer treatment facility to serve an individual facility, such as a mobile home park, the department is required to consider, in connection with its application of section 91.32 of the regulations, the economic and financial ability of the applicant to connect to a public sewage treatment facility.

3. In our consideration of such economic and financial ability in this case, we conclude that the

department did not act unreasonably in denying to Miller a permit to construct a private sewage treatment plant on the grounds that connection to a public sewage treatment plant was feasible.

4. In considering any application for a sewage treatment facility, however, the department is also required to consider the other factors listed in section 5 of the Clean Streams Law, supra, and in article I, sec. 27, of the Constitution of Pennsylvania.

5. In this case, the department did not consider the impact of the construction of one, and possibly two, sewer lines upon the area through which that sewer line necessary to connect Miller's facility with the Shrewsbury Sewage Treatment Plant would pass, or upon the area to be served by such sewer line(s), and in this respect the department's considerations leading to its decision in this case were not legally adequate.

## ORDER

And now, August 27, 1974, the action of the department denying a permit to Paul K. Miller to operate a private sewage treatment plant to serve the Paul K. Miller Mobile Home Park is reversed, and the case is remanded to the department for further analysis and action consistent with this decision.